No. 2--08--0208

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--1001 |
| MICHAEL J. CALABRESE, | ) ) | Honorable Philip L. DiMarzio, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Michael J. Calabrese, was convicted of first-degree murder (720 ILCS 5/9--1(a)(3) (West 2004)) on January 18, 2008, after a jury trial. He was sentenced to 45 years' imprisonment plus an additional 25 years pursuant to the mandatory add-on for using a firearm (730 ILCS 5/5--8--1(a)(1)(d)(iii) (West 2004)). On appeal, defendant argues that: (1) the trial court failed to comply with Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007); (2) there was insufficient evidence to prove his guilt beyond a reasonable doubt; (3) the trial court erred in knowingly allowing the jury to hear witness Patrick Calabrese invoke his fifth amendment privilege; and (4) his 70-year sentence was excessive given his mitigating factors. We affirm.

I. BACKGROUND

On August 22, 2005, defendant was indicted for the murder of Edmund Edwards. The indictment alleged that on May 1, 2005, defendant shot Edwards during a dice game at the Foxview apartment complex in Carpentersville, causing his death. On October 22, 2007, the trial court began voir dire proceedings. At the start of the proceedings, the trial court summarized the charges against defendant and stated that he pleaded not guilty. The trial court then stated:

"The defendant is presumed innocent.

The prosecution has the burden of proof. The burden of proof is proof beyond a reasonable doubt. Only if this burden of proof is met can the defendant be found guilty.

The defendant is not required to prove his innocence. The defendant is not required to present any evidence.

The defendant is not required to testify. If the defendant does not testify, you as jurors must not use that against him in deliberating upon your verdict."

The trial court then had the clerk administer the oath to all prospective jurors. Twelve panel members were called to the jury box, and the trial court asked whether any of them had cases pending in the county. During the first voir dire session, juror numbers 248, 47, 148, and 251 were called. The court asked each juror individually, "Do you accept the legal principles that I have mentioned?" The jurors all responded "yes." In the second panel, juror numbers 44, 92, 210, 61, and 163 were called and asked individually, "Do you accept the legal principles that I have mentioned?" and each answered "yes." Following a break for lunch, juror numbers 32 and 57 were called and asked individually "[d]o you accept the legal principles that I have mentioned?" and each responded "yes." The court then recessed and upon returning to session with a new group of prospective jurors, the court recited:

"The defendant is presumed to be innocent. The prosecution has the burden of proof. The burden of proof is proof beyond a reasonable doubt. Only if that burden of proof is met could the defendant be found guilty.

The defendant is not required to prove his innocence. The defendant is not required to present any evidence. The defendant is not required to testify.

If the defendant does not testify, you as jurors must not use that against him in deliberating upon your verdict."

After these instructions were provided, the trial court continued questioning potential jurors. Juror number 39 and alternate juror numbers 46, 29, and 73 were called and asked individually, "Do you accept the legal principles that I have mentioned?" Each juror responded "yes."

After being asked whether they accepted the legal principles that were mentioned, the jurors were asked questions relating to their backgrounds, connections to the legal system, and potential connections to the case. Ultimately the jurors mentioned here by number were selected for defendant's jury.

On October 23, 2007, the case proceeded to trial. The following facts are derived from the trial transcripts. Carlos Gonzalez, a Carpentersville police officer, testified first for the State. At approximately 2:45 a.m. on May 1, 2005, Officer Gonzalez was completing a traffic stop approximately one-quarter-mile northeast of the Foxview apartment complex when he heard a gunshot coming from the direction of Foxview. Officer Gonzalez got in his vehicle, and another officer, Robert Drews, who was also at the traffic stop, got in his vehicle, and they drove to the apartment complex. The apartment complex was on Oxford Road with buildings on the east and west sides of the road. Approximately 23 two-story residential buildings comprise the complex, with

three side streets that run through them: Oak Crest, Oxford, and Middlesex. Officer Gonzalez entered the parking lot of 13 Oak Crest, and he saw a group of people. The people directed him to the grassy median between the parking lots of 20 Oxford and 14 Oxford. Officer Gonzalez went to that area and saw Edwards, also known as "Tay Tay," lying on the ground and unresponsive. The victim was lying between two parked minivans, and he had cash in his left hand. Officer Gonzalez described the parking lot as "fairly well lit." He did not recall seeing defendant at the scene and did not recall seeing any other traffic entering or exiting the parking lot.

Officer Drews testified next. Officer Drews was completing a traffic stop with Officer Gonzalez at approximately 2:45 a.m. on May 1, 2005, when he heard a gunshot coming from the direction of the Foxview apartment complex. He and Officer Gonzalez returned to their respective vehicles and drove over to the apartment complex. As he was driving over, Officer Drews heard a dispatch that an ambulance was being sent to Foxview because a man had been shot in the area of 14 and 20 Oxford. The officers were directed to the grassy median between the parking lots of 14 and 20 Oxford, and they saw Edwards lying face down between two minivans. In the victim's left hand, Officer Drews saw $140 cash. He took the money into evidence. Officer Drews also retrieved $670 cash in the victim's pocket. Later that day, Officer Drews attended the autopsy of Edwards and was handed a bullet that was removed from the victim's body cavity. He also was given the victim's clothing and identified the victim's coat.

Keisha Ligon testified for the State as follows. In May 2005, Ligon resided at 21 Oxford, in a second-floor apartment. Ligon knew Edwards and his girlfriend as acquaintances from the complex. On May 1, 2005, Ligon returned to Foxview from a Minnesota trip at approximately 2 or 3 a.m. Ligon came back with Rudy Marcial, in his vehicle. When they arrived, Ligon talked to some

people who were outside 20 Oxford while Rudy retrieved his intoxicated brother from a vehicle and left to take the brother home. Ligon testified that there were many people outside of 20 Oxford, and some people were playing a dice game on the sidewalk. Her friend Angie was playing the dice game and complaining about losing her money. She noticed a green van parked near the sidewalk where the dice game was being played. One of the men Ligon saw outside was a man she knew as "Mike," and she described him as Mexican or Puerto Rican, with low-cut hair. She had met the man a few days before the May 1 shooting, when the man was playing with Ligon's pet pit bull outside the apartment building. Ligon had spoken to the man for about a minute and this had occurred in the daytime. On May 1, she also saw a second woman named Angie and a woman named Isha outside but they were not playing the dice game.

After about five minutes of talking with the people in front of 20 Oxford, Ligon went into her apartment and lay down. About five minutes later, Ligon "heard a pow." She stated it sounded like a gunshot but she did not get up. Ligon then received a phone call in which the caller told her to look out her window. She looked out her window and saw the parking lot area. Police were putting up yellow tape. Ligon testified that she did not go outside but admitted that police spoke with her immediately after the incident.

On May 3, 2005, Ligon went to the Carpentersville police department and spoke with Sergeant Bosshart. She admitted that she told Sergeant Bosshart that her name was Monique Johnson. Sergeant Bosshart showed Ligon a photo lineup and she identified the man she knew as "Mike" by marking the initials "MJ" next to the photo. Ligon identified the man she knew as "Mike" as defendant in the courtroom.

Ernest LeFlore testified next. In May 2005, LeFlore resided in the 3 Middlesex building of the Foxview apartment complex. On the morning of May 1, 2005, around midnight to 1 a.m., LeFlore returned to his apartment from a trip to Chicago. He dropped off his girlfriend and two children at their building and then drove down the street, where he saw about five people shooting dice. LeFlore knew "Tay Tay" and testified that he was one of the people shooting dice. LeFlore also identified defendant as a man he saw standing against a wall. LeFlore testified that he heard defendant say "whoever win[s] the dice game [is] going to get stuck up." After he heard that comment, LeFlore started to look over at defendant more. LeFlore saw some females around the dice game but he could not recall their names.

LeFlore played the dice game but lost. After losing, he quit and went to sit in his car. He quit because "the dude say he was going to stick the game up *** and I got scared." Approximately 20 minutes later, LeFlore saw defendant walk away from the game and then return to the game about 5 minutes later with a hooded shirt and a face mask. He knew it was defendant despite the face mask because of the clothes that he had on and because defendant had been one of only about two or three "white guys" standing out there by the dice game. LeFlore saw defendant walk to Tay Tay and saw Tay Tay get up and walk away with defendant. The two men walked to LeFlore's right and he saw that defendant was holding a black revolver, something like a .38 special. Defendant said to Tay Tay "give me that shit" as the men walked toward a parked van. LeFlore could not see anything when they walked ahead of the van. He then heard a bang, and everyone ran. At that point, LeFlore ran forward toward the bushes, and he saw defendant running toward the bushes as well. He was ahead of defendant and they both ran through the bushes and into the street. He saw defendant enter a small car that was waiting there.

LeFlore admitted that he had smoked about half an ounce of marijuana that night. However, he testified that he could see clearly. He smoked marijuana on a daily basis, usually about half an ounce. LeFlore admitted that he was convicted of resisting a peace officer in 2003, unlawful possession of a controlled substance with the intent to deliver in 1997, violating an order of protection in 2006, and criminal trespass in 2007. He admitted that he had difficulty identifying the area of the crime in photographs that were taken at night. He denied telling police days after the incident that he smoked marijuana with girls named Isha and Coco. He denied telling police days after the incident that he thought the man standing against the wall was known as "Big Pun." He denied telling officers at the scene on the morning of May 1, 2005, that he saw the individual who did the shooting, that he could identify the shooter, and that he saw someone running but did not know it was the shooter. LeFlore denied that he spoke with any officer at the scene. He testified that he tried to get his car from the lot and that the officers just took his information down. LeFlore testified that the officers came and "hollered" at him the next day.

LeFlore admitted that on May 2, 2005, he was brought into the Carpentersville police department and asked to look at a photo lineup. He admitted that he identified three individuals as the potential offender. He testified that he chose three Hispanic males, and then police showed him another group and he picked one from those photos. The police then showed him another group and he picked one from those photos. He admitted that he did not know which photos he selected from the various lineups. Further, upon cross-examination, LeFlore denied having smoked marijuana before arriving at court, denied smoking it the day before court, and admitted smoking it two days prior to court, but could not recall whether he smoked it three days earlier. LeFlore stated that he could not remember "that far back."

Lawana Butler testified for the State as follows. On May 1, 2005, Butler resided at 11 Oxford in the Foxview apartment complex. Butler identified a photograph of Patrick Calabrese, defendant's brother, and stated that she knew him as "Patrick" or "Big Pun" or "Big Folks." She had known Patrick for approximately three to four months as of May 2005. Around midnight on May 1, 2005, Butler was watching a movie with her cousin Victoria. Patrick came in and Victoria and Butler helped him upstairs and into bed because he was drunk. Butler then went to bed herself, fell asleep, and awoke to the sound of a gunshot. She ran into Victoria's room, tripped over Patrick, who was now naked and asleep on the floor, and proceeded to look out the window. Butler saw someone lying in the parking lot across the way.

Patrick's phone then began to ring, and Butler brought his phone to him. He spoke to the caller but she did not know who he was speaking to. While she was looking out the window, a friend named Nicki knocked on her door. Butler spoke to her and then went to bed. When she awoke at 7 a.m., Patrick was in the bathroom. He left her apartment around 8 a.m.

On cross-examination, Butler admitted that the statement she made to police did not contain the details that she helped Patrick upstairs because he was drunk and that she tripped over a naked Patrick when she went to the window. She explained that the officers did not ask whether she helped Patrick up the stairs. She told them that Patrick and Victoria went upstairs to bed and that she went to bed also. She did not mention tripping over Patrick but told them that she went to the window to look outside.

Angela Lewis testified to the following. On May 1, 2005, Lewis resided in the 20 Oxford building of the Foxview apartment complex. In the early morning hours of May 1, Lewis was watching television. Around 1 a.m., she went outside to look for a ride to the store because she

wanted to buy some beer. A man named Jefferson refused to give her a ride but she stayed outside talking to him in the parking lot of her building. She was standing in the parking lot area closest to her building. A grassy median divided the parking lot of her building and the lot of 15 Oak Crest. She saw other people shooting dice near 15 Oak Crest. She recognized Tay Tay as one of the men playing the dice game. She also saw a girl named Isha, a man named Stefano, a little boy whose name she did not know, and a man she knew as "Mikey." She knew Mikey from being at Foxview. She described him as a Hispanic male with a close haircut and medium build. Lewis identified defendant in court as the man she knew as Mikey. Lewis did not see defendant shoot dice or walk away from the game at all. As Lewis was talking with Jefferson, she saw Tay Tay try to get up and take two steps. She saw him take two steps, but he fell because he had been shot. She heard Edwards say "I've been hit" and then everyone started running. Lewis testified that she saw defendant shooting a gun. Edwards then fell near the side of a gray minivan.

Lewis ran to her neighbor's house at 20 Oxford, banged on the door, and asked to call an ambulance for Edwards. Lewis saw defendant run toward the back of the complex, behind the 20 Oxford building. Two days later, Lewis identified defendant in a photo lineup at the Carpentersville police station. She admitted that defendant had been wearing a face mask but testified that it did not cover his entire face, and she was able to identify him.

On cross-examination, Lewis testified that she did not drink while watching the dice game, did not see others drinking, and did not see anyone smoke marijuana. When Lewis saw defendant outside, he was wearing a white T-shirt and a denim jacket with gray sleeves and a gray hood. The mask covered his face from the nose down. Lewis further testified that she saw "fire" come from defendant's left hand and then saw that Edwards had been shot. She admitted that when an officer

questioned her the next day she told the officer that she did not see anything. She admitted that she initially lied. Upon further questioning, Lewis admitted that she changed her story to police. She told police that she was watching television, went to her kitchen window, and saw several people shooting dice. She told police that she then leaned out of the window and saw a guy she knew as "Mikey" walk away from the dice game, walk across the street, and put a mask on his face. Lewis testified that this story was not true and admitted that she had lied to the police again.

Further on cross-examination, Lewis denied hearing defendant yell or argue with anyone or hear him say anything to Edwards. Lewis denied that she was gambling or yelling about losing her money and wanting her money back. She admitted that the first time she had ever told anybody that she was actually outside when the shooting took place was in court that day. On redirect examination, Lewis clarified that she did give this information to a defense investigator a week prior to her appearance at trial. She explained that she waited to tell the entire truth because she was afraid. The prosecutor also brought out the fact that Lewis's details about the shooting did not change, only the location from where she witnessed the event.

Cedric Walker testified next. Walker knew Tay Tay for two to three months in May 2005. He did not know Tay Tay's real name. Walker frequented the Foxview apartment complex because both his cousin and the mother of his children resided at 15 Oak Crest. Walker arrived at the apartment complex around 9:30 p.m. on April 30, 2005. After visiting with his cousin and his girlfriend, he went outside to the porch area of 15 Oak Crest. Walker observed some people shooting dice across the parking lot and identified Tay Tay as one of them. Walker consumed two beers while watching people play dice. Walker testified that he was within 43 feet (the measurement of the courtroom) of the dice game and that he actually could see the dice game. He denied that he

participated in the dice game. While watching the dice game, Walker heard a person named "Mike Mike" say that he was going to rob the dice game. Walker stated that he was about eight feet away from "Mike Mike" when he heard him say this. "Mike Mike" had lost at the dice game and was angry. Walker knew "Mike Mike" from meeting him the day before through a friend named Kendell. Walker then identified defendant in the courtroom as "Mike Mike." Walker thought that defendant was "just playing" when he said that he was going to rob the game.

After defendant made the statement, people paused and looked at defendant but then continued to play the game. Defendant then walked away from the game. Walker next saw defendant come around the building, telling everyone to give him all their money. Defendant then displayed his gun, which was black and small like a revolver. Defendant again said "everybody give me your money." Tay Tay looked at defendant and then turned away from defendant. Tay Tay walked away and defendant came up behind him, near some parked vans, and Walker heard a "pow." After Walker heard the pow, he saw Tay Tay staggering and fall near a green electrical box. Defendant then took off running toward a wooded area and then Walker could not see him anymore. Walker stated that defendant was approximately eight feet from Tay Tay when he shot him. Walker denied originally telling police that defendant was two or three feet away.

On May 9, 2005, Walker was interviewed by police and identified defendant in a photo lineup. Walker admitted that he had been convicted twice of resisting a peace officer, and once each of attempted obstruction of justice, obstructing service of process, aggravated fleeing and eluding a police officer, unlawful delivery of a controlled substance, and burglary. On cross-examination, Walker stated that there were more than 10 people playing dice and more than 20 people outside around the complex area but not shooting dice. From the time defendant said that he was going to

rob the game until the time he returned with the gun, Walker estimated that it was about five minutes. Walker described defendant's clothing as a black hoodie and jeans. It was dark outside so Walker was not sure of the color of the jeans. He denied that defendant had a mask around the bottom of his face but stated that defendant had his hood on. He admitted that he did not see what happened when he heard the "pow," because defendant and Tay Tay were in between two vans. He stated that no one was drinking or smoking blunts. After the shooting, Walker went inside his cousin's apartment and received a phone call from his cousin who had run out of gas nearby. Walker left to help his cousin. He did not call police to tell them that he just witnessed defendant shoot Tay Tay. Walker did not tell anyone that he saw the shooting. When he returned from helping his cousin, he did not inform any of the police officers on the scene that he witnessed the shooting. The first time he spoke with the police was when they arrested him on May 8, 2005, for domestic battery. While in custody for that arrest, Walker informed a Carpentersville police officer that he had some information about a shooting. He explained that he did not tell police his information earlier because he feared that the police would run his name and find a warrant out for his arrest. Walker denied that the warrant was out on a complaint made on May 5, four days after the shooting. He explained that he had a domestic violence incident in April, as well. On redirect examination, Walker did not remember telling police in a statement that defendant's hoodie was blue with gray sleeves.

Dr. Brian Mitchell, a coroner's physician for Kane County, testified as follows. Dr. Mitchell performed the autopsy on Edwards. He observed that the gunshot wound entrance on Edwards' body was located on the left side of the middle of his back. There was no exit wound. The bullet entered Edwards' chest cavity, struck his spleen, struck his liver, struck his diaphragm, and struck a portion of his lung before it finally penetrated the left ventricle of his heart and hit his sternum. The bullet

was recovered from Edwards' body and given to an officer from the Carpentersville police department. According to Dr. Mitchell, the bullet trajectory ran up from the entrance point of the left mid-back toward the heart. Dr. Mitchell opined that it would be possible for a person to walk some distance with this injury because the bullet did not strike a portion of the heart that would have caused instant death. Dr. Mitchell also identified a graze wound on Edwards' left temple. The graze wound did not penetrate the skull.

Timothy Bosshard, detective commander of the Carpentersville police department, testified that he presented a photo lineup to a woman claiming to be Monique Johnson, who identified defendant as the shooter. Brad Van Horn, a Carpentersville police officer, testified that he interviewed Lewis and that she identified defendant in a photo lineup as the shooter. Carpentersville police detective John Steinhable testified that he had Walker review a photo lineup. Walker identified defendant in the photos as the person who shot Edwards. Detective Steinhable stated that he had been asked to get Walker two ibuprofen pills for his broken hand and that when he walked into Walker's cell area, Walker approached him and started talking about the shooting at Foxview. Walker was in custody for a domestic-abuse charge at the time.

Outside the presence of the jury, the court brought in Patrick's attorney, Mike Krejci. Krejci informed the court that Patrick intended to assert his fifth amendment right not to testify. The State informed the court that it elected to give Patrick witness use immunity. The court advised Patrick that he was being granted immunity from prosecution in a criminal case as to any information, direct or indirect, that was derived from his testimony. The court further advised Patrick that any information derived from his testimony could not be used against him in a criminal case, except for perjury, and that if he refused to answer a question after being granted this immunity, he would be

held in direct criminal contempt. The court advised Patrick that direct criminal contempt would be a Class 2 felony and carry a penalty up to seven years in prison followed by two years of mandatory supervised release.

Patrick was then sworn in and questioned outside the presence of the jury. Patrick admitted that he was defendant's brother and had known defendant his entire life. When asked whether defendant lived in Wauconda back in May 2005, Patrick asserted his fifth amendment right. The court advised Patrick that he would be held in contempt if he refused to answer. Again, Patrick asserted his fifth amendment right. The State then asked where Patrick was on April 30, 2005, and Patrick asserted his fifth amendment right. The court then found Patrick in direct criminal contempt for failing to answer the question. This repeated for every question that followed.

The State then requested to present Patrick to the jury to establish that he was refusing to testify, because it did not want the jury wondering why he was not presented as a witness. The defense objected, arguing that the witness should not be presented to the jury at all. The State argued that it should be allowed to present the witness since the defense, in its opening argument and questioning of witnesses, had insinuated that Patrick and not defendant was the offender. Citing to People v. Crawford Distributing Co., 78 Ill. 2d 70 (1979), for the proposition that allowing a witness to testify knowing that he will invoke the fifth amendment may not always be error, the trial court determined that the State's motive in calling Patrick would not be a flagrant attempt to build its case out of inferences arising from the use of testimonial privilege. The trial court also did not believe that Patrick's refusal to answer would "add critical weight to the prosecution's case or indeed any weight." The trial court allowed the State to call Patrick to the witness stand in front of the jury but would not allow it to ask the entire series of questions that it asked outside the jury's presence. The

-14-

trial court ruled that with the limited questioning, the jury could see that Patrick was not going to answer questions and could view neutrally his assertion of his fifth amendment right not to testify. The trial court also observed that it could just as easily benefit the defense as explain why the State was not calling him as a witness.

In the presence of the jury, Patrick was asked his name, age, and location of residence, and whether he knew defendant. Patrick answered and acknowledged that defendant was his brother. The State then asked the following:

> "Q. Sir, I'm going to direct your attention to April 30, 2005, at approximately 8:30, can you tell the jury where you were?
>
> A. Plead the Fifth, sir."

The State then stated it had no further questions. Patrick was released as a witness, and the State called its next witness.

John Galason, a Carpentersville police officer, testified next. On May 1, 2005, Officer Galason interviewed Rudy Marcial in connection with the investigation of the shooting death of Edwards. Marcial's hair was longer than the shooter's had been described so Officer Galason knew he was not the shooter when he met him. Marcial died on December 1, 2005. On May 24, 2005, Officer Galason was informed that defendant turned himself in on a warrant, so he went to pick him up from the Kankakee County jail. On cross-examination, Officer Galason admitted that he decided that Marcial could not be a suspect because his hair was about one half of an inch in length. He admitted that Marcial was not placed in any physical lineup. He was not sure whether Marcial's photo was used in a photo lineup. Officer Galason also testified that he interviewed LeFlore and

remembered that LeFlore told him that he had seen the shooter before and thought his name was Big Pun.

The defense first called Grant Gerleman, a Carpentersville police officer. Officer Gerleman stated that he met with LeFlore on May 2, 2005, and presented him with a photo lineup. Defendant, Patrick, and Anthony Colon were included in the lineup but LeFlore did not identify anyone from the photos. On cross-examination, Officer Gerleman stated that in the first lineup, defendant's photo was not included and LeFlore did not select anyone. In the second photo array, LeFlore did not select anyone and Patrick's photo was not included. In the third array, LeFlore identified three men who could have been the shooter, and one of those three was defendant. Officer Gerleman admitted that he did not mark the other two men LeFlore selected, but marked only defendant's photo.

Detective John Spencer of the Carpentersville police department testified next for the defense. On May 8, 2005, Detective Spencer was dispatched to the Foxview apartment complex to investigate Walker as a possible suspect in an unrelated report of a shooting. He admitted that he informed Walker that he was named as a possible suspect, in either a disturbance or a shooting. Detective Spencer and other officers dispatched to the scene determined that the report of a shooting or disturbance was a false report. He ran Walker's name through the computer and determined that there were warrants out on Walker for domestic batteries. On cross-examination, Detective Spencer acknowledged that at the time Walker was arrested, he was no longer a suspect in the shooting and was arrested on multiple warrants for domestic batteries. The State moved the court to take judicial notice that there were two warrants out on Walker, dated March 17, 2005, and May 1, 2005, for domestic batteries, and that information was given to the jury at the close of evidence, in the form of a stipulation.

Diane Calabrese, defendant's mother, testified that defendant was right-handed.

Joseph Pilarski, a Carpentersville police officer, testified next for the defense. Officer Pilarski interviewed LeFlore on May 1, 2005. LeFlore told him that he heard a gunshot and ran for cover. While running, LeFlore saw a subject running north between the buildings but he could not see whether it was the shooter or someone else also running for cover. Officer Pilarski stated that this was all that LeFlore told him. LeFlore did not tell him that he saw the shooter. On cross-examination, Officer Pilarski explained that he was a patrol officer and that detectives would follow up on interviews on crimes such as this one. He took LeFlore's name and contact information and passed the information on to detectives.

On October 25, 2007, the jury found defendant guilty of first-degree murder, and the case then proceeded to a hearing on defendant's eligibility for the death penalty. On November 15, 2007, the trial court determined that defendant was eligible for the death penalty pursuant to section 9--1(b) of the Criminal Code of 1961 (720 ILCS 5/9--1(b) (West 2004)).

On January 14, 2008, defendant's sentencing hearing commenced, and the following facts were derived from the transcripts of that proceeding. The State first called James Altergott. Altergott first met Patrick Calabrese in 1999 or 2000 and through their friendship, Altergott came to know defendant. In 2003, Altergott was working at an Amoco station in Wauconda. Patrick came into the station and stole some beer, and Altergott reported the incident to police. Sometime after that incident, defendant and Patrick were at Altergott's residence in Lake in the Hills and defendant physically assaulted Altergott for talking to the police about his brother. Eventually Patrick and another friend told defendant to stop and defendant left. In 2004, while Altergott was working at a

Clark station, defendant and his brother Tony came in and shoplifted. Altergott was afraid to call the police but the next day the manager reported the theft.

Agnes Cebulka testified that she worked at a Subway in Wauconda on November 2, 1999. Nicole Paddock, a friend of one of Cebulka's employees, was with a group of men who were arguing near the entrance. Cebulka asked them to leave. One man came inside the store and began arguing with Paddock. The man kicked Paddock in her stomach and knocked her into a potato chip rack. Cebulka called the police.

Paddock testified next. Paddock stated that on November 2, 1999, she was 16 years old and had had a sexual relationship with defendant. On that date, Paddock was in a Subway store in Wauconda, visiting with a friend who worked at the store. Defendant came in and began arguing with Paddock about rumors that Paddock was pregnant. Defendant kicked her, and the manager of the store called police. Paddock did not want the police called but she admitted providing a written statement to them. She admitted that she wrote that defendant said "if you is pregnant, not no more [sic]" after he kicked her in the stomach. Paddock did not press charges, and she was not pregnant at the time of the incident. The kick did not cause her to fall down and did not require medical treatment. Defendant did not have or use a weapon during that incident. Paddock denied that defendant was ever violent with her before or after that incident and testified that she was never afraid of him.

Josette Crisp testified next. In March 1994, Crisp resided in Elgin with her daughter Christine Crisp. In April 1994, Crisp discovered that defendant, age 14 at that time, had sexual intercourse with Christine, who was 10 years old. Defendant lived in a neighboring apartment, and when confronted, defendant denied the accusation. Crisp reported the abuse to police. In June 1994,

defendant slapped Christine because she "told on him about the sex thing." Police were called on that incident. In July 1994, defendant came up to Crisp's porch area and threatened that he would kill her if he had to go to jail, and if he could not do it, his brother would. Defendant raised his shirt up to show what appeared to be a gun in the waistband of his pants. Crisp reported the incident to police. Crisp admitted that Christine did not tell her that defendant forced her to have sex with him. She also admitted that Christine had beaten up Patrick or was in the midst of beating up Patrick when defendant slapped her. Crisp acknowledged that Christine was having psychological and behavioral problems at the time of the incident and was in therapy.

Christine Crisp testified next. In March 1994, Christine was 10 years old and was on the front porch of a neighbor's apartment when defendant came over and asked her to go inside. She allowed him inside and he began touching her. Christine did not try to stop him, because she was afraid as she had been molested by a cousin just before this and that cousin threatened her not to tell. She admitted that defendant did not threaten her at that time. After the incident was reported to police, Patrick and Christine would get into fights about her getting defendant into trouble. In June 1994, defendant walked up to her and slapped her in the face. Her mother called the police and reported the incident. Christine acknowledged that she probably had beaten up Patrick that same day but was not certain. In July 1994, defendant threatened to beat up Christine for telling people he raped her. Christine admitted that defendant did not hurt her when they had sex and that she probably did tell a Children's Advocacy Center representative that she was "sort of happy" about the incident and probably would have sex again. Christine acknowledged that she was seeing a psychologist and had behavioral problems at that time.

Brian Gorcowski, a detective with the Elgin police department, testified that on June 3, 1994, he went to the Crisp home to respond to a battery complaint. Christine had a red mark across her cheek and she told him defendant had slapped her for telling people that he raped her. Detective Gorcowski arrested defendant. Detective Gorcowski testified that at that time the Elgin police department had substations in high-crime areas and that a substation was in defendant's apartment complex.

Dr. Jerome Vance, a psychiatrist from Benchmark Behavioral Health Systems in Utah, testified as follows. Benchmark was an 84-bed inpatient psychiatric facility that specialized in treating chronically offending males. In 1995, Dr. Vance was assigned to defendant, who was referred by the Illinois court system. Defendant stayed at Benchmark from January 1995 to January 1996. Dr. Vance did not note any head injuries or medical problems that may have predisposed defendant to psychiatric issues. Defendant was referred as a result of the sexual-abuse incident with Christine, and Dr. Vance initially diagnosed defendant with an impulse-control disorder and a conduct disorder because of his repeated history of breaking the law. Dr. Vance found defendant uncooperative as he did not want to be there, did not want help, and did not think that he needed help. Defendant exhibited "flash anger" and was considered an assault risk for staff members. He threatened staff members and others frequently. Defendant tended to blame others and the system for his problems and had little empathy for others. Defendant expressed a desire to go to jail instead of participating in therapy or attempting to make behavioral progress. When he agreed to take medications, such as Zoloft, defendant improved but inevitably he would refuse medication. In October 1995, defendant was placed in the intensive treatment unit. In January 1996, defendant was sent back to Illinois, having unsuccessfully completed treatment at Benchmark. Although defendant

did not improve at Benchmark, Dr. Vance testified that he had some executive function in his brain, meaning he had exercised the ability at times to make good decisions such as taking medication and cooperating with therapy. At the end of defendant's stay at Benchmark, Dr. Vance diagnosed him with bipolar disorder because he had severe ups and downs and reacted well to medications designed to treat that disorder.

On cross-examination, Dr. Vance admitted that no one asked defendant's mother about her pregnancy with defendant. He also did not follow up on the fact that it was indicated in defendant's substance-abuse assessment that his mother was a heavy drug user until 1989. Dr. Vance admitted that defendant's childhood was chaotic, that he suffered from separation anxiety, night terrors, tantrums, and nightmares, and that he was impulsive and rebellious. Dr. Vance acknowledged that defendant admitted that he touched a 10-year-old girl but he said that she "came onto him" and called him afterward and that he did not believe he needed treatment. He denied penetrating her. In defendant's mind, he did not rape the girl, because she consented. Dr. Vance acknowledged that defendant did not have a father-figure growing up and that his mother had significant health problems. However, Dr. Vance believed that shooting Edwards after losing at the dice game represented defendant's lack of impulse control and not a decreased executive functioning of his brain. In other words, Dr. Vance believed defendant was acting intentionally and purposefully.

The State next called Thomas Robertson, a Wauconda police officer. Officer Robertson was called to a Subway sandwich shop in October 1999. At the scene, Officer Robertson interviewed Ronald Goosens. Mr. Goosens' son had been missing and Mr. Goosens was there to pick up his son from the Subway store. Mr. Goosens told Officer Robertson that he was confronted by defendant when he attempted to take his son home and that defendant threatened him with bodily harm. Mr.

Goosens made a written statement of this event. Later, on November 2, 1999, Officer Robertson responded to another call at the Subway shop, which involved Paddock. When he arrived, Paddock was extremely upset and sobbing. She told him that she and defendant had had a fight and that he kicked her. Paddock told Officer Robertson that after he kicked her, defendant stated that if she had been pregnant, she was no longer pregnant.

Mr. Goosens testified that he and his son had domestic problems but he did not recall any of the events at the Subway.

The State next called Kevin Kulinski, a former Wauconda police officer. Officer Kulinski arrested defendant in November 1999 on a domestic-abuse warrant. While defendant was being booked, he became irate and uncooperative. Defendant told Officer Kulinski that he had a gun that had bullets that could go through his protective vest. Officers attempted to move defendant to a holding cell and he resisted and threatened them. When one officer took out his pepper spray, defendant stated that if he were sprayed, he would break the officer's jaw. Officer Kulinski also testified to an incident in 1998, in which defendant was implicated in shooting a BB gun at passing cars.

John Combs, a Wauconda police officer, testified next for the State. In 2000, Officer Combs responded to a call reporting that three men left a playground building that stored generators and equipment. Defendant was one of the men who fled the building. A fire extinguisher was missing. When Officer Combs stopped the men, defendant shouted obscenities at him.

Thomas Bender, a Wauconda police officer, testified that in 2000, he responded to Officer Combs' call for assistance in an arrest. When he arrived on the scene, defendant was screaming obscenities. Officer Bender advised defendant to quiet down or he could cite him for disturbing the

peace. Defendant responded with, "Come over here and I will beat your ass," and he raised his arm. Officer Bender told defendant that he was now under arrest, and defendant resisted. A struggle ensued. Defendant spit on the squad car's windshield. In the booking area, defendant continued to resist and be verbally abusive. Defendant wanted to fight all of the officers and threatened them. Defendant then spit in Officer Bender's face.

In another incident in 2000, Officer Bender responded to a call that some people were smoking marijuana in the park. When Officer Bender arrived, defendant began to walk away. Defendant then threw his cigarettes and began to run away from the officer. Officer Bender apprehended defendant and found a small baggie of marijuana in his pocket.

Anthony Jacobson, a Wauconda police officer, testified consistently with Officer Bender's account of the park incident, in which defendant was arrested for possessing marijuana and resisting arrest. He further testified that he had received information that defendant had a handgun. Officer Jacobson spoke to defendant's mother to let her know about the possibility and requested permission to search the home for it. She refused but stated that she would look for it. Later, defendant's mother informed Officer Jacobson that she found a weapon and disposed of it herself.

Jason Johnson, a Wauconda police officer, testified that in 2004, he went to a Clark gas station to observe video surveillance of two men shoplifting. One of the men was defendant. Altergott had witnessed the event and told Officer Johnson that he did not call police to report it because he was afraid of defendant as defendant had physically attacked him for previously reporting Patrick for theft.

Wauconda police officer Ted Hennessy testified consistently with Officer Johnson's account of the Clark gas station incident of 2004. He further testified that he interviewed defendant about

the incident. Defendant claimed that Altergott would allow defendant to take items and that Altergott was "dumb and retarded" and "knew that if he resisted" defendant would beat him.

Paul Dubar Dunaway, a sergeant with the Kane County sheriff's office, testified that in November 2005, defendant was housed in the Kane County jail's isolation unit. Defendant was angry about being in that cell and threatened to flood his toilet. Defendant was written up for the infraction.

Victoria Trybula, a Kane County correctional officer, testified that in 2006, she performed a shakedown of cells on her block, including defendant's. When she awakened defendant, defendant told Officer Trybula that she should have done the shakedown earlier and that he did not want to be awakened. She wrote defendant up for the infraction but it was dismissed.

Donald Hanson, a Kane County correctional officer, testified that during a 2005 shakedown, defendant told him to "take that flashlight out of my face, punk." Defendant was written up for insolence and failing to make his bed.

Chris Ducay, a sergeant with the Kane County sheriff's office, testified that he reported to defendant's cell in 2005 when defendant had threatened to flood his cell. Defendant was very angry and threatened to go after another officer. Defendant was written up for the threats. In other incidents, defendant was disciplined for possessing a sharpened spoon in his cell, a physical altercation with another inmate, and a verbal altercation with another inmate.

At the close of its witnesses' testimony, the State moved to admit certified copies of defendant's convictions of retail theft and criminal sexual assault, his violation of probation, and his delinquency adjudications of theft and burglary.

The defense first called Kenneth Bledsoe, also known as Tony Cologne. Bledsoe had known defendant his entire life. Bledsoe admittedly had been convicted of sexual assault and was a "drunk" for many years. He had known defendant's mother, Diane, since the late 1960s and had lived with her and defendant on and off for years. He denied being a father-figure to defendant, because Bledsoe was "high" for most of his twenties and thirties. Bledsoe was the biological father of Diane's first daughter, Michelle, and lived with Diane and her subsequent children, including defendant.

Bledsoe testified that he physically and mentally abused Diane in front of the children, including defendant, and physically abused defendant. At one point, the Department of Children and Family Services (DCFS) became involved after Bledsoe beat defendant so badly that he had welts, but nothing ever happened to the complaint. Bledsoe's mother, Lucy, lived with the family until her death when defendant was approximately seven years old, and Lucy physically abused defendant also. In addition, Michelle, who was much older than defendant, often was defendant's caretaker and she too physically abused defendant.

Bledsoe described the area where they resided as an Elgin subdivision known for gangs and drug abuse. He and Diane abused drugs and alcohol in the home for years and in the presence of the children. When defendant was young, Diane was diagnosed with hepatitis and was often ill, eventually requiring a liver transplant. Because of Diane's health, defendant's care often was short-changed. On cross-examination, Bledsoe admitted that he drank considerably and abused speed, marijuana, sometimes cocaine, and acid. He admitted that he lost days but not weeks due to his drug abuse and always went to work. Some memories were hazy but he knew that defendant was abused throughout his youth. Bledsoe also knew that defendant had one leg shorter than the other and was

teased a lot by other kids. This resulted in some of his anger and his violence toward others. Bledsoe's older son, Tony, spent a lot of time with defendant, which was bad because Tony was a gangbanger, was violent, and did drugs.

Antonette Kulotta, defendant's maternal grandmother, testified that defendant was a good child but had bipolar issues. Diane tried to get defendant help but he was always uncooperative. Kulotta noticed that defendant returned from Benchmark angrier and seemed to have a bad attitude.

Defendant's mother, Diane Calabrese, testified next. Diane testified that defendant's father probably interacted with defendant only four times. She also acknowledged that they lived with Bledsoe, who was physically and mentally abusive toward her in front of defendant. Additionally, Bledsoe was a Latin King and abused drugs and alcohol. When she became pregnant with defendant, Diane was at high risk due to liver problems. After she gave birth, a biopsy of her liver revealed that she was in the early stages of cirrhosis. Approximately six or seven years later, she was diagnosed with hepatitis. Until she had a liver transplant in May 1992, she was very sick, often bedridden, and unable to work. Diane and her kids bounced around among friends, family, Bledsoe's home, and Lucy's home during that time. According to Diane, Lucy was abusive and excessively disciplined the children. Lucy and Bledsoe also had a volatile relationship, and defendant was exposed to the violence in the household.

Diane also stated that until defendant had corrective surgery in 1993, defendant was taunted because one leg was shorter than the other. When defendant was two years old, he hit his head on a cement block and required five or six stitches. Additionally, he had several gashes on his head and she was not sure of their origin. In March 1988, one of Diane's relatives called DCFS to report that

defendant was abused, after seeing his bruises from a beating by Bledsoe. Defendant was never removed from the home, and Diane remained living with Bledsoe.

According to Diane, defendant began showing behavioral problems in kindergarten. He was eventually diagnosed with attention-deficit-hyperactivity disorder. Throughout his school years, defendant showed no interest in classes and eventually he joined a gang like his older stepbrother Tony. After he returned from Benchmark and the jail term that ensued, she felt he was very mean and very aggressive. In 1997, defendant had a son with a woman who now lives in Georgia with the child. Defendant maintained phone contact with his son after the mother moved out of state, and he often asked Diane about the child after his incarceration.

James Patrick Corcoran, a forensic psychiatrist, testified next for the defense. Dr. Corcoran initially interviewed defendant in jail on June 3, 2006, and conducted additional interviews after that. He also interviewed Diane and reviewed defendant's medical records from Benchmark and the county jail, 2007 MRI test results, and 2007 electroencephalogram test results. He completed his final report on July 9, 2007. Dr. Corcoran concluded that defendant had specific neurocognitive deficits, including a decreased ability to tolerate frustration and manage conflict in his life. Defendant was also unable to sustain focused attention, had impulse-control problems, and had some executive dysfunction, meaning he struggled to perform tasks in a logical manner. Dr. Corcoran believed defendant's neurocognitive problems were caused by multiple head injuries that he suffered during adolescence. Defendant's MRI was normal, meaning he had no structural abnormalities. However, functional abnormalities show up in neuropsychological testing. Dr. Corcoran diagnosed defendant with bipolar disorder, which is characterized by mood instability. He believed that defendant developed the disorder around age 12 and he confirmed that Benchmark had diagnosed

defendant with the illness at age 14. Dr. Corcoran admitted that the only evidence of head trauma was defendant's report that he had two head injuries that resulted in loss of consciousness and two head injuries that did not. No medical reports existed to verify the injuries.

Mark Douglas Cunningham, a forensic psychologist, testified next for the defense. Dr. Cunningham interviewed defendant, his mother, his half-sisters Michelle and Tanya, his grandmother, his stepbrother Tony, Bledsoe, and defendant's aunt and cousin. He further reviewed defendant's medical and legal records. In his analysis, defendant was always at a higher risk for delinquency because of his mother's high-risk pregnancy, early behaviors demonstrating attention-deficit-hyperactivity disorder, and his early physical abnormality of one side of his body growing at a different rate. Further, his family had a history of drug and alcohol abuse, criminal behavior, and domestic abuse throughout the household. In looking to defendant's family history, Dr. Cunningham found a history of schizophrenia, major depressive disorder, bipolar disorder, attention-deficit disorder, and personality disorders. These psychiatric disorders predisposed defendant to similar mental disorders. According to Dr. Cunningham, these were factors defendant had no control over. Growing up, defendant was also at a disadvantage because his family moved frequently, lived in a high-crime, low-income area, and suffered physical abuse, and defendant had suffered some head injuries.

Dr. Robert Hanlon, a clinical neuropsychologist, testified next for the defense. Dr. Hanlon performed a battery of standardized neuropsychological tests after gathering defendant's social, psychiatric, medical, and personal background. Dr. Hanlon determined that defendant had attention-deficit-hyperactivity disorder, executive dysfunction, meaning he had poor decision-making and problem-solving skills, and reduced mental capacity. Dr. Hanlon also believed that defendant

suffered from bipolar disorder, which affected defendant's ability to tolerate frustration and manage conflict. Dr. Hanlon explained that the fact that defendant's MRI and EEG tests were normal did not establish that defendant did not suffer head injuries, because often there will not be structural damage.

Nancy Leefers, a social worker with the "Death Penalty Trial Assistance Unit" of the appellate defender's office, interviewed Scharmin Tabron, the mother of defendant's son. A videotaped message from Scharmin to defendant was played for the court.

After the parties argued in closing, defendant made a statement of allocution, asking the court for mercy given his upbringing and his remorse for what he had done. On January 18, 2008, the court sentenced defendant. The court ultimately determined that the murder in this case, albeit horrible and tragic, did not rank with many of the murders chronicled in the supreme court and appellate court reports. Thus, the court determined that death was an inappropriate sentence. The court then went on to consider the statutory aggravating factors pursuant to section 5--5--3.2 of the Unified Code of Corrections (Code) (730 ILCS 5/5--5--3.2 (West 2004)) and nonstatutory aggravating factors. In aggravation, the court determined that defendant was on mandatory supervised release for a retail theft conviction at the time of the offense and that he had a significant criminal and juvenile record. In mitigation, pursuant to section 5--5--3.1 of the Code (730 ILCS 5/5--5--3.1 (West 2004)), the court determined that none of the factors listed applied to defendant. The court then sentenced defendant to 45 years' imprisonment before the mandatory 25-year add-on was imposed. Thus, defendant was sentenced to a total of 70 years' imprisonment.

On March 7, 2008, the trial court denied defendant's motion for a new trial and to reduce his sentence. Defendant timely appealed.

## II. ANALYSIS

### A. Supreme Court Rule 431(b)

Defendant first argues that the trial court failed to strictly comply with Rule 431(b) because it did not individually question the prospective jurors whether they understood and accepted each of the fundamental principles outlined in People v. Zehr, 103 Ill. 2d 472, 477 (1984). At the outset, we note that defendant neither objected at the time of voir dire nor raised this issue in his posttrial motion. Regardless, we may review a forfeited error under the plain-error rule if either the evidence is so closely balanced that the jury's verdict may have resulted from the error and not the evidence or the error was so serious that the defendant was denied a substantial right and thus a fair trial. See People v. Anderson, 389 Ill. App. 3d 1, 4-5 (2009). However, we must first determine whether an error occurred. People v. Blair, No. 2--07--0862, slip op. at 4-5 (September 29, 2009).

Rule 431(b) provides:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007.[1]

We interpret supreme court rules in the same manner as statutes, applying the cardinal rule of construction in which we ascertain and give effect to the intent of the drafter, using the plain and ordinary language of the rule. Blair, slip op. at 9-10. If the language of the rule is clear and unambiguous, we need not resort to any other interpretive aids. Blair, slip op. at 10. Where an issue concerns compliance with a supreme court rule, this court reviews the issue de novo. People v. Graham, 393 Ill. App. 3d 268, 270 (2009).

In 1997, the supreme court rewrote Rule 431 to ensure compliance with its decision in Zehr. 177 Ill. 2d R. 431, Committee Comments, at 1xxix; Blair, slip op. at 7. Prior to the May 2007 amendment to Rule 431(b), the court was required to admonish potential jurors and ascertain whether they understood and accepted the Zehr principles only if the defendant requested that such admonishment be provided. 177 Ill. 2d R. 431(b). The committee comments stated:

"The new language is intended to ensure compliance with the requirements of People v. Zehr, 103 Ill. 2d 472 (1984). It seeks to end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." 177 Ill. 2d R. 431, Committee Comments, at 1xxix.

The May 2007 amendment changed the rule to require that the trial court ask potential jurors whether they understand and accept the Zehr principles, and moreover provide each juror with an opportunity

[1]Defendant did not object to the fourth principle relating to his right not to testify; therefore, we proceed on the premise that the trial court was required to admonish jurors on all four principles.

to respond to the specific principles. Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007; Blair, slip op. at 15-16.

Defendant relies on Anderson for support of his position that the trial court's method of questioning jurors violated Rule 431(b). In Anderson, the trial court provided three of the four principles outlined in Rule 431(b) and promulgated by Zehr, in narrative form, not in questions, to the first 12 panel members, and asked the panel members as a group whether they would sign the appropriate verdict form if the State had or had not met its burden of proof. Anderson, 389 Ill. App. 3d at 5-7. The appellate court determined that the trial court's question was a general question concerning the jurors' willingness to follow the law, the exact practice Rule 431(b) had intended to end. Anderson, 389 Ill. App. 3d at 7-8. In addition to mentioning only three of the four Zehr principles, the trial court had further not determined whether the majority of empaneled jurors understood and accepted the principles. Anderson, 389 Ill. App. 3d at 8. The trial court did not satisfy the stringent requirements of Rule 431(b) and the appellate court reversed and remanded for a new trial, finding that a Rule 431(b) error was so serious that the defendant was denied a substantial right and thus a fair trial. Anderson, 389 Ill. App. 3d at 9.

We agree with the State that the facts of this case are distinguishable from the facts in Anderson in that the trial court here conveyed all four Zehr principles. We also agree that the trial court adhered to Rule 431(b)'s requirement that each juror be asked, individually or in a group, whether that juror understood and accepted the Zehr principles, and each juror was given an opportunity to respond to specific questions concerning the principles. Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007). Here, the trial court asked each juror whether he or she accepted the principles that the court had described, and each juror had the

opportunity to ask questions or state that he or she did not understand or accept the principles. Each juror, however, responded that he or she did understand and accept the principles.

Defendant argues that the trial court's method of inquiry did not provide the jurors an opportunity to respond to specific questions concerning the Zehr principles. He argues that the trial court's method of inquiry was "so minimal that it is doubtful that the jurors even remembered what the judge was referring to when he asked if they 'accepted the legal principles' that the judge mentioned earlier in the day." Defendant essentially argues that the trial court was required to ask four separate questions to each juror as to whether he or she agreed with each stated principle. We disagree. The jurors were admonished as to all four Zehr principles and each juror was individually asked whether he or she accepted all four Zehr principles. Each juror, thus, had an opportunity to state that he or she did not understand what the trial court was asking or that he or she did not agree with or accept any of the principles. Further, each juror had the opportunity to ask questions at that time.

Cases following the 2007 amendment do not compare with the facts of this case in that in each of those cases, the trial court either failed to address every Zehr principle or failed to ask the jurors about any or all of the Zehr principles. See People v. Glasper, 234 Ill. 2d 173, 185 (2009) (trial court failed to question jurors on Zehr principles after the defendant had requested such questioning pursuant to the pre-2007 version of Rule 431(b)); People v. Blanton, No. 4--08--0120, slip op. at 9 (November 10, 2009) (trial court admonished jurors as to only three of the four Zehr principles and trial court failed to address and question jurors on the defendant's right not to testify where the record showed no objection to that principle being addressed); People v. Arredondo, No. 1--07--2825, slip op. at 13-14 (October 8, 2009) (trial court failed to ask the potential jurors whether

they understood and accepted the four Zehr principles); People v. Madrid, No. 1--08--0324, slip op. at 10 (October 8, 2009) (trial court failed to ask potential jurors whether they understood and accepted the four Zehr principles); Blair, slip op. at 17-25 (trial court asked jurors whether they accepted some, but not all, Zehr principles by asking specific questions rather than an open-ended question regarding all four principles; thus, jurors were not afforded an opportunity to answer about every principle); People v. Wilmington, No. 1--07--2518, slip op. at 17 (September 24, 2009) (trial court provided all four Zehr principles but failed to ask jurors whether they accepted the principle pertaining to the defendant's right not to testify when it asked jurors whether they accepted each of the other three principles); People v. Owens, 394 Ill. App. 3d 147, 154 (2009) (trial court merely admonished jurors of four Zehr principles but failed to ask any of them whether they understood and accepted them); People v. Graham, 393 Ill. App. 3d 268, 273-74 (2009) (trial court failed to address one of the four Zehr principles and failed to question some jurors if they accepted the reasonable-doubt standard where trial court posed questions specifically); People v. Alexander, 391 Ill. App. 3d 419, 430-32 (2009) (trial court questioned jurors regarding only presumption-of-innocence principle); People v. Stump, 385 Ill. App. 3d 515, 521-22 (2008) (trial court failed to question jurors about their understanding and acceptance of two of the four principles). Accordingly, we determine that the trial court did not violate Rule 431(b).

## B. Sufficiency of the Evidence

Defendant argues that the State failed to prove him guilty of first-degree murder beyond a reasonable doubt because its eyewitnesses were all convicted felons and liars who gave inconsistent accounts of the murder. A reviewing court faced with a challenge to the sufficiency of the evidence must view the evidence in the light most favorable to the prosecution and determine whether any

rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. People v. McCoy, 378 Ill. App. 3d 954, 962 (2008), citing People v. Collins, 106 Ill. 2d 237, 261 (1985). We will not retry the defendant, and determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are the responsibilities of the trier of fact, not this court. McCoy, 378 Ill. App. 3d at 962. A reversal is warranted only if the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt regarding the defendant's guilt. McCoy, 378 Ill. App. 3d at 962.

Defendant attacks the testimony of LeFlore, Walker, Lewis, and Ligon. First, defendant argues that LeFlore's testimony was severely impeached by the facts that he admitted to smoking marijuana while he was outside watching the dice game, that he was a convicted felon, and that he gave police prior inconsistent statements. At trial, LeFlore denied that he told police that he was smoking marijuana with two teenage girls and that he saw a man known as Big Pun watching the dice game. He further denied stating that the man was 30 feet away from him, not 5 feet away. LeFlore also identified three individuals in the police lineups, one of whom was defendant and two of whom the police never documented.

Defendant argues that Walker's testimony was unreliable because he gave prior inconsistent statements to police. He told police first that the shooter wore a blue hoodie with gray sleeves and blue jeans, but at trial stated that he wore a black hoodie and that it was too dark to identify the color of his jeans. Walker also admitted that he was drinking that night. Defendant argues that Lewis was incredible because she was an admitted liar who changed her story many times. At trial, she stated that she was outside when she saw Edwards get shot, although she previously stated that she watched from her window. Ligon initially lied about her identity to police. Defendant also argues that both

Lewis and LeFlore testified that the shooter held the gun in his left hand, while Diane Calabrese testified that defendant was right-handed.

Defendant further argues that the witnesses' accounts were inconsistent on certain details, such as whether defendant wore a mask, whether he walked away and returned with the gun, and which direction he ran. Given the unreliability of the State's eyewitnesses in addition to the State's lack of physical evidence, defendant argues, the State failed to meet its burden and reversal is warranted.

We disagree with defendant. Defendant's attacks on the witnesses' testimony pertain to the weight it should be given and the witnesses' credibility, which are tasks for the trier of fact. In this case, defense counsel thoroughly impeached each witness on his or her criminal background and prior inconsistent statements. The jury's responsibility was to resolve credibility issues and inconsistencies and decide the weight that should be given to the testimony. We cannot say that the jury's result was irrational given the fact that many of defendant's points, such as the witnesses' criminal backgrounds, whether they were drinking or smoking marijuana that night, and whether they had smoked marijuana with two teenage girls, did not directly pertain to their identification of defendant as the shooter. The differences among the witnesses' stories, such as whether the shooter had a mask, whether he left and came back, and which direction he ran after the shooting, were also inconsistencies that the jury had to resolve. The facts that defendant's mother stated that he was right-handed and that certain witnesses stated that the shooter held the gun in his left hand also did not require the jury to disregard the witnesses' accounts, because a right-handed person may still shoot a gun with his left hand. While the witnesses' versions had some inconsistent details, the jury obviously determined that the key portions of their testimony were consistent in that they saw

defendant follow Edwards with a gun to an area between two vans, heard a gunshot, saw Edwards stagger and fall down, and saw defendant run away. See People v. Brooks, 187 Ill. 2d 91, 133 (1999) (noting that minor variances in witnesses' accounts are to be expected anytime several people see an event under traumatic circumstances). A rational trier of fact could infer from the evidence that defendant was the shooter despite the variances in some of the details, and despite the witnesses' prior inconsistent statements, drug or alcohol usage, and prior criminal convictions. Accordingly, we cannot say that, viewed in the light most favorable to the prosecution, the evidence was so improbable that reversal is warranted.

### C. Patrick Calabrese's Invocation of Fifth Amendment

Next, defendant argues that the trial court erred in allowing the State to call Patrick to the witness stand when it knew that he would invoke his fifth amendment right not to testify. The trial court's allowing Patrick to testify was an evidentiary ruling, which we review using an abuse-of-discretion standard. People v. Human, 331 Ill. App. 3d 809, 819 (2002). It is not automatically error for a prosecutor to call a witness to the stand knowing that the witness will invoke his fifth amendment right. People v. Izquierdo, 262 Ill. App. 3d 558, 563 (1994). "Each case must be decided on its own facts and circumstances and both the motive of the prosecutor and the likelihood of the jury drawing unfounded inferences against the defendant must be considered." Izquierdo, 262 Ill. App. 3d at 563. It will be reversible error if the State makes an obvious attempt to build its case out of inferences arising from the privilege or if the witness's refusal to testify adds critical weight to the State's case. Izquierdo, 262 Ill. App. 3d at 563.

In this case, the State explained that it wanted to present Patrick because defense counsel, in his opening statement, had suggested that Patrick was the actual offender. The State did not want

the jury wondering why it did not present Patrick as a witness to refute that argument. The trial court determined that the State's motive was not a flagrant attempt to build its case from the privilege and that the evidence would not add critical weight to the State's case. In fact, the trial court determined that defendant could just as easily benefit from the witness because the jury could infer that Patrick was the shooter and thus invoked his fifth amendment right to protect himself. Defendant argues that the jury could have easily inferred that Patrick was refusing to testify in order to protect his brother as the shooter. We agree with the State.

In Izquierdo, the State, knowing a witness would not cooperate, called the witness purportedly to testify against the defendant regarding some incriminating conversations they had, and the witness's lack of cooperation reflected badly on the defendant. Izquierdo, 262 Ill. App. 3d at 564. The appellate court reversed and remanded the case for a new trial. Izquierdo, 262 Ill. App. 3d at 564. In this case, the State wanted to call Patrick to establish that he was sleeping in Butler's apartment and thus refute defense counsel's opening argument that Patrick was potentially the actual culprit. Patrick's lack of cooperation could have led the jury to infer that he was protecting himself or his brother. However, the State's case was clearly built upon the three eyewitnesses and Butler, who testified that Patrick was asleep in her apartment at the time she heard gunfire, and not upon Patrick's invocation of his fifth amendment right. Further, considering the evidence that the other witnesses provided, we cannot say that Patrick's refusal to testify added "critical weight" to the State's case. Therefore, we cannot conclude that the trial court abused its discretion in allowing Patrick to invoke the fifth amendment on the witness stand.

D. Excessive Sentence

Finally, defendant argues that his 70-year sentence was excessive given his youth, background, and remorse and the nature of the offense. Defendant argues that he should have received the minimum possible sentence, 45 years' imprisonment, pursuant to sections 5--8--1(a)(1)(a) and 5--8--1(a)(1)(d)(iii) of the Code (730 ILCS 5/5--8--1(a)(1)(a), (a)(1)(d)(iii) (West 2004)). Absent an abuse of discretion by the trial court, an authorized sentence may not be altered on review. People v. Hauschild, 226 Ill. 2d 63, 90 (2007). The trial court is granted great deference in imposing a sentence because the trial court is generally in a better position than a reviewing court to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, and habits while determining the appropriate sentence. People v. Stacey, 193 Ill. 2d 203, 209 (2000). While the trial court is charged with wide discretion in sentencing, Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)) grants a reviewing court the power to reduce the sentence imposed by the trial court. Stacey, 193 Ill. 2d at 209. A sentence will be "deemed excessive and the result an abuse of discretion where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." Stacey, 193 Ill. 2d at 210.

Defendant raises People v. Margentina, 261 Ill. App. 3d 247 (1994), People v. Brown, 243 Ill. App. 3d 170 (1993), and People v. Gibbs, 49 Ill. App. 3d 644 (1977), in support of his argument for this court to reduce his sentence to the minimum. We find those cases distinguishable on the facts. Margentina, 261 Ill. App. 3d at 249 (the defendant was 18 years old, had been raised in a terrible environment, was provoked by the victim, and was sentenced to a term that was twice the minimum sentence); Brown, 243 Ill. App. 3d at 176 (the defendant was 20 years old and lacked any prior criminal history); Gibbs, 49 Ill. App. 3d at 649 (the defendant was 19 years old, was steadily

employed, lived with his parents and contributed to their income, and had no previous criminal record).

Here, we cannot say that the trial court abused its discretion. The sentencing range for first-degree murder was 20 to 60 years, and defendant was additionally subject to a mandatory 25-year add-on for having used a firearm. The minimum possible sentence for defendant was 45 years and the maximum was 85 years. In its decision, the trial court properly considered the statutory aggravating factors, finding that others need to be deterred from committing similar acts, that defendant had a significant criminal history, and that he was on mandatory supervised release when he committed the crime. Defendant, who was 25 years old at the time, shot a man in the back, unprovoked, over a dice game. The sentencing hearing established that defendant had violent episodes and trouble conforming to the boundaries of the law throughout his life. No statutory mitigating factors were present. While the defense presented evidence of mental health issues and a troubled upbringing, those factors do not necessitate a minimum sentence. The trial court stated that given "the character of the defendant, the nature and circumstances of the offense, and the public interest," a 45-year sentence plus the 25-year add-on was an appropriate sentence. The sentence imposed is neither at great variance with the spirit and purpose of the law nor manifestly disproportionate to the nature of the offense. Accordingly, we decline to reduce the sentence imposed by the trial court.

### III. CONCLUSION

In conclusion, we find that the trial court did not violate Rule 431(b), that the evidence was sufficient to establish defendant's guilt beyond a reasonable doubt, that the trial court did not err in allowing defendant's brother to invoke his fifth amendment right in the presence of the jury, and that

the trial court's sentence was appropriate.  Thus, we affirm the judgment of the circuit court of Kane County.

Affirmed.

BURKE and SCHOSTOK, JJ., concur.