2016 IL App (3d) 140120

Opinion filed July 13, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2016

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-14-0120 |
| v. | ) | Circuit No. 09-CF-618 |
| | ) | |
| ALI LEMONT EVANS, | ) ) | The Honorable Stephen Kouri, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CARTER delivered the judgment of the court, with opinion.
Presiding Justice O'Brien concurred in the judgment and opinion.
Justice Schmidt dissented, with opinion.

**OPINION**

¶ 1    Defendant was found guilty of first degree murder. 720 ILCS 5/9-1(a)(3) (West 2008) (a

person who kills an individual without lawful justification commits first degree murder if, in

performing the acts which cause the death, he is attempting or committing a forcible felony).

Defendant was sentenced to 58 years of imprisonment. On appeal, defendant argues, *inter alia,*

that his constitutional right to confront witnesses was violated where the prosecutor continued to

question a witness, in the presence of the jury, and the witness refused to testify and repeatedly

asserted his fifth amendment privilege against self-incrimination. U.S. Const., amend. V. We reverse and remand for a new trial.

¶ 2                                    FACTS

¶ 3        Defendant was charged with first degree murder, based on allegations that on May 27, 2009, he and codefendant, Deangelo Lindsey, shot the store clerk, with a handgun, during an attempt to commit armed robbery. The trials of defendant and his codefendant—Lindsey—were severed.

¶ 4        Prior to defendant's trial, defendant filed a motion to suppress incriminating statements that he made to police, arguing that his right to counsel was violated because police continued to interrogate him after he had requested an attorney. The trial court denied the motion, and defendant was subsequently convicted of first degree murder and sentenced. On appeal, this court reversed defendant's conviction and remanded for a new trial, finding that the motion to suppress should have been granted because defendant had invoked his right to counsel and did not initiate the subsequent incriminating conversation with police. *People v. Evans,* 2012 IL App (3d) 100737-U.

¶ 5        On remand, the case proceeded to a jury trial. During opening statements, the prosecutor told the jury that defendant had fired four shots into the victim's body and then fled with Lindsey, leaving the victim to die. The prosecutor informed the jury that Sheanneya Sherman drove into the gas station parking lot as defendant "was turning the [victim] into a corpse." The prosecutor indicated that Sheanneya saw two people run out of the gas station store, one of whom she recognized as a person named "Ali" and she later identified as defendant. The prosecutor further indicated that the murder weapon was found in the house of Lindsey's sister

2

and matched "the bullets pulled out of [the] poor [victim]'s body." The prosecutor also thanked jurors for their attention on behalf of the victim.

¶ 6        On the first day of trial, witnesses testified that the body of the deceased store clerk was discovered behind the counter of the gas station store. Four .22-caliber cartridges were removed from the store clerk's body during the autopsy. The cartridges were sent to the state crime laboratory for analysis. The sister of Lindsey testified that she lived in an apartment two houses from the gas station, which she allowed police officers to search.

¶ 7        Following a lunch break on the first day of trial, the prosecutor informed the trial court that the State intended to call Lindsey to testify by way of immunity. Defendant's counsel informed the trial court that he spoke with Lindsey's appellate counsel via telephone, and appellate counsel had indicated that he was Lindsey's attorney of record because in Lindsey's case there was a pending petition for leave to appeal to the Illinois Supreme Court. Lindsey's appellate counsel had not been contacted about Lindsey testifying in defendant's trial and he wanted to speak with Lindsey regarding his intent to assert his fifth amendment right against self-incrimination. The prosecutor argued that Lindsey did not have the right to assert his fifth amendment because he had been given "use immunity" and that Lindsey should be held in contempt if he refused to testify. Defendant's attorney argued that Lindsey should not be put on the witness stand "without the benefit of speaking with his attorney of record." The trial court found that defendant would not be prejudiced if Lindsey did not speak with his attorney of record prior to testifying, noting that Lindsey had already been able to consult with his trial attorney.

¶ 8        The State called Sheanneya Sherman to testify. Sheanneya testified that she had turned into the gas station parking lot to make a U-turn when she saw two men run out of the gas station store and flee into the alley behind the gas station. The first man's face was covered and he was

3

holding a gun. The second man had a bag in his hand and Sheanneya recognized him as a person named "Ali." Sheanneya reported her observations to police two days later when she found out that the store clerk had been killed. Sheanneya identified defendant from one of hundreds of photographs. She also identified defendant from an in-person lineup. Sheanneya testified at trial that she was "a hundred percent positive that the [d]efendant [was] the second person out of the store with the bag in his hand."

¶ 9 Sheanneya's father, Larry Bush, had been in the car with Shaeanneya on the day of the incident. He testified that he saw two African American "kids" run out of the gas station store— one of them was carrying a gun and the other was carrying a bag. Larry described the two males as 17 or 18 years of age. The first person out of the store jumped the fence near the back of the store and the other person stood by the dumpsters holding the gun in the air. Larry had viewed a police lineup but was not able to make an identification.

¶ 10 Police detective Keith McDaniel testified for the State. The prosecutor asked McDaniel what he did after he had questioned defendant. McDaniel responded that after speaking with defendant he "went to locate Lindsey" and searched the home of Lindsey's sister. Defendant's attorney objected. Outside the presence of the jury, defendant's attorney moved for a mistrial, arguing that McDaniel's testimony was prejudicial in that it directly went to defendant's inculpatory statements that had previously been suppressed. The trial court sustained the objection and denied defendant's request for a mistrial. When the jury returned, the trial court instructed the jury to "[d]isregard that question and answer."

¶ 11 McDaniel testified that in conducting a search of the apartment of Lindsey's sister, police found a handgun. The apartment was located two houses away from the gas station. Lindsey's

fingerprint was found on the handle of the gun. A forensic scientist testified that the bullets recovered from the victim's body were fired from the handgun found in the apartment.

¶ 12		Outside the presence of the jury, the prosecutor informed the trial court of her intent to call Lindsey as a witness and that Lindsey intended to invoke his fifth amendment right against self-incrimination. The prosecutor argued that Lindsey could not assert the fifth amendment right against self-incrimination where he had immunity because nothing he said could be used against him. Defendant's attorney objected to the State presenting Lindsey as a witness when the prosecutor knew that he would assert his fifth amendment right not to testify. The trial court allowed the State to call Lindsey as a witness. The trial judge indicated "for the record" that he was allowing the State to call Lindsey as a witness pursuant to *People v. Calabrese,* 398 Ill. App. 3d 98 (2010) (allowing the State to call defendant's brother to testify was not an abuse of discretion, although court knew that brother would invoke his fifth amendment right not to testify, where defendant had suggested that his brother was the actual offender and the State's motive was to refute that argument).

¶ 13		Lindsey confirmed that he intended to plead the fifth to "[e]very question." The trial court informed Lindsey that he did not have a fifth amendment right to refuse to testify because he was given immunity and he would be ordered to answer the questions or be subject to contempt. Lindsey confirmed that he understood but still intended to "plead the Fifth." The jury was brought back into the courtroom.

¶ 14		The following direct examination of Lindsey took place in the presence of the jury:

> "Q. [Prosecutor]: Would you state your name?
>
> A. Deangelo Lindsey.
>
> Q. And are you from the Peoria area?

5

A. Yes, ma'am.

Q. Do you know a person by the name of Tonica Fullilove?

A. Yes, ma'am.

Q. How do you know her?

A. It's my sister.

Q. And back in May of 2009, did she live at 1207 West McClure?

A. Yes, ma'am.

Q. And were there times that you would frequent her apartment on McClure?

A. Yeah.

Q. I want to direct your attention to May 27th of 2009. Did you go into the USA Gas Station and attempt to commit an armed robbery?

A. I plead the Fifth.

[PROSECUTOR]: Judge, I would—

THE COURT: I'm instructing you to answer that question.

[LINDSEY]: I plead the Fifth.

THE COURT: All right, I'm going to tell the jury this: [Lindsey] has been given what we call use immunity, which means that nothing he says today in testimony can ever be used against him, and he's refusing to answer. He doesn't have the privilege to refuse to answer, so I'm ordering –

[LINDSEY]: So I can't not answer a question? That's what you-all are saying?

6

THE COURT: Exactly. You're to answer.

[LINDSEY]: So me as a human, I can't answer.

THE COURT: I'm ordering you—

[DEFENDANT'S ATTORNEY]: Your Honor, I will object at this point. He is asking for legal advice. His counsel is not here.

THE COURT: Are you representing him?

[DEFENDANT'S ATTORNEY]: I'm not representing him.

THE COURT: I'm ordering you to answer the question.

[LINDSEY]: I want to talk to my lawyer.

THE COURT: Are you refusing to answer the questions?

[LINDSEY]: To any other questions, I plead the Fifth.

BY [PROSECUTOR]:

Q. You're currently in the Department of Corrections?

A. Yes, ma'am.

Q. That's for first degree murder?

A. Accountability.

Q. For first degree murder?

A. Yes, ma'am.

Q. Do you know a person by the name of Ali Evans?

A. Yes, ma'am.

Q. And do you see the person you know as Ali Evans in court today?

A. Yes, ma'am.

7

Q. Could you point him out and describe what he's wearing?

A. (Indicating) In a black suit, glasses, look real nice.

[PROSECUTOR]: Judge, may the record reflect the witness identified the defendant?

THE COURT: Noted for the record.

BY [PROSECUTOR]:

Q. How do you know Mr. Evans?

A. Associate.

Q. How long have you been an associate with him?

A. Been locked up for a year, so I can't really answer that.

Q. Prior to that, how long had you been an associate with [defendant]?

A. We really just got to know each other, so I—three, four months—three to four months.

Q. And were you with Mr. Evans on May 27th of 2009?

A. I plead the Fifth. I don't remember.

Q. You don't remember?

A. No, ma'am.

Q. Well, do you remember going into the USA Gas Station on May 27th of 2009?

A. I plead the Fifth.

Q. Do you remember?

A. Plead the Fifth.

Q. The Judge informed you [that you don't have that right.

A. I plead the Fifth.

Q. Do you remember going into the USA Gas Station on May 27th of 2009?

A. I'm not really trying to be rude or anything, but I'm pleading the Fifth, so I'll just be quiet from here on out.

Q. And the Judge informed you that you cannot do that and is ordering you to testify.

A. Yes, ma'am.

Q. So do you remember? Do you remember when the gas station clerk died? Let's start with the easy one. Do you remember that? That's a question.

A. I plead the Fifth.

Q. And you don't have that right. Yes or no, do you remember – yes or no, do you remember when the gas station clerk lost his life? Do you remember, yes or no?

A. I plead the Fifth.

Q. Let's start with—let's start with another easy one. Do you remember the gun you used when the gas station clerk lost his life.

A. I plead the Fifth.

Q. Do you remember the gun you touched?

A. That's a question?

Q. Yes.

9

A. I plead the Fifth.

Q. Well, your fingerprints are on the gun.

A. To my knowledge, it's not my trial. I got found guilty, remember?

Q. So you don't know if your fingerprints were on the gun?

A. I plead the Fifth.

Q. You plead the Fifth?

A. Yes, ma'am.

Q. You don't have that right. Were your fingerprints on the murder weapon?

A. I plead the Fifth.

Q. Were your fingerprints on it because you grabbed the murder weapon from Ali Evans?

A. I plead the Fifth.

Q. Were you at your sister's house or sister's apartment before you went over to the gas station?

A. I plead the Fifth.

Q. You have to answer the question. Were you at your sister's apartment before you and Mr. Evans went to the gas station?

A. My answer is I plead the Fifth.

Q. Were you just chilling at your sister's crib before you went to the store? (No response) Were you chilling at your sister's crib before you went to the store?

10

A.  I'm not going to answer any more questions.  I'm giving you all the same answer every time.

Q.  I know, and you can't use that answer.

A.  I'm wasting you-all time.  You-all got me up here.

Q.  It's a simple yes or no question.

[DEFENDANT'S ATTORNEY]:  Your Honor, I'll object to further questioning.

THE COURT:  Why don't you approach.

(A bench conference was held.)

BY [PROSECUTOR]:

Q.  On May 27th, 2009, when you and Mr. Evans went into the store and Mr. Evans was up in front of the cashier, did you tell him that there wasn't a gun?  There was no gun, Bro?

A.  I plead the Fifth.

[DEFENDANT'S ATTORNEY]:  Objection.

THE COURT:  Overruled.

BY [PROSECUTOR]:

Q.  When the two of you went in the store, was the purpose to rob the store clerk, but that you were simply at that point going to see how many people were in the store.

A.  I plead the Fifth.

Q.  Or how many people are working?

11

A.  I plead the Fifth.

Q.  Did you go through the middle aisle, and Bro, being Mr. Evans, walked around the first aisle and said, Fuck this shit.  Ain't nobody here.  And then he went up to the cashier.

[DEFENDANT'S ATTORNEY]:  Objection.

A.  My answer is the last time I'm answering, I plead the Fifth.

THE COURT:  What's your objection?

[DEFENDANT'S ATTORNEY]:  This is just the prosecutor testifying at this point, [Y]our Honor.  He's told us very clearly he's not going to answer any more questions.

THE COURT:  He did answer some questions.  I'm going to—but I will sustain it in the sense that we are getting to—I mean, it's leading, so—

[PROSECUTOR]:  Could we approach on that?

THE COURT:  Yes.

(A bench conference was held.)

BY [PROSECUTOR]:

Q.  Did Ali Evans go up to the clerk and say, give me that shit.  Give me that shit?

[DEFENDANT'S ATTORNEY]:  Objection.

THE COURT:  Sustained.

BY [PROSECUTOR]:

Q.  What did Ali Evans say to the cashier?

12

[DEFENDANT'S ATTORNEY]:  Objection.

THE COURT:  Overruled.

BY [PROSECUTOR]:

Q.  What did the cashier do?

A.  I'm not answering any more questions.  I'm pleading the Fifth.

Q.  Did the cashier bend down to reach for money?

[DEFENDANT'S ATTORNEY]:  Objection.

[LINDSEY]:  You-all can't take me out of here?

THE COURT:  Hold on.  Overruled.  To answer your question now—

[LINDSEY]:  I'm not answering your questions.  I plead the Fifth, sir.

THE COURT:  Okay.

[LINDSEY]:  I don't know nothing.  I want to go back to where I belong in your eyes, and I'll leave it at that.

BY [PROSECUTOR]:

Q.  Did [defendant] shoot the cashier?

[DEFENDANT'S ATTORNEY]:  Objection.

THE COURT:  Overruled.

BY [PROSECUTOR]:

Q     Did Ali shoot the cashier?  It's a yes or no question.  Did Ali shoot the cashier?  (No response).  Enjoy your life in prison.

[DEFENDANT'S ATTORNEY]:  Objection, your Honor.

[LINDSEY]:  Don't object.  Don't object.  She mean that, her exact meaning.

13

[PROSECUTOR]: I have no further questions.

THE COURT: Sustained. Disregard that last comment. [Counsel for defendant], do you want to ask any questions?

[LINDSEY]: Why disregard it? She meant it. This is the people that got us going to jail.

THE COURT: All right. Take him out.

[LINDSEY]: Good luck with your trial, Bro."

¶ 15 As indicated above, Lindsey testified that he was currently residing in the Department of Corrections (DOC) for accountability for first degree murder and knew defendant as an "[a]ssociate." The prosecutor repeatedly asked Lindsey various questions about the robbery and the shooting of the store clerk, to which Lindsey replied 20 times, "I plead the Fifth."[1]

---

[1] The prosecutor's questions to Lindsey closely paralleled Lindsey's testimony from his own trial, which was not made part of the record in this case but was set out in the opinion resulting from Lindsey's direct appeal. See *People v. Lindsey*, 2013 IL App (3d) 100625, ¶¶ 22-24. As set out in the *Lindsey* opinion, at his trial, Lindsey testified to the following: on the day of the offense Lindsey was 17 years old and had met up with defendant at the home of Lindsey's sister; Lindsey and defendant discussed robbing defendant's uncle; defendant had a gun; defendant and Lindsey went to the nearby convenience store to buy some juice and a cigarillo; Lindsey did not have a weapon; the store clerk refused to sell Lindsey a cigarillo because he was too young to buy tobacco; Lindsey gave defendant money to buy the cigarillo; Lindsey heard defendant say, "Give me that shit" and saw defendant pointing a gun at the clerk; Lindsey asked defendant what he was doing, and defendant pointed the gun at Lindsey and told Lindsey to shut up; defendant shot the clerk as the clerk was reaching under the counter; Lindsey had his cell

14

¶ 16    In defendant's case, the State called its final witness—Corey Braggs. Braggs testified that he was currently in jail on felony charges and expected to receive a lesser sentence for his testimony in this case. Braggs testified he was defendant's cellmate and, in July of 2013, defendant told Braggs that he and Lindsey had planned the robbery of a gas station and Lindsey had grabbed items from behind the counter while defendant "had a gun to the man." Braggs also testified that defendant told him that he shot the store clerk twice because he got scared when the store clerk reached for something and that defendant and Lindsey hid the gun at the home of Lindsey's sister. Defendant had further told Braggs that Lindsey would "probably plead the 5th" when called to testify at defendant's trial.

¶ 17    After the State rested its case, defense counsel motioned the court for a directed verdict. The trial court denied the motion.

¶ 18    Brian VonBehren testified for the defense that he was a convicted felon and currently residing in the Peoria County Jail and was in the same "jail pod" as defendant and Braggs. A jail pod consisted of five jail cells, with two inmates in each jail cell. In the four months that they were all in the same jail pod, VonBehren had never seen defendant and Braggs hang out together or have a conversation with each other. According to VonBehren, defendant and Braggs did not get along and Braggs did not like defendant. Braggs had told VonBehren that morning that he did not like defendant.

phone in his hand as he and defendant ran out of the store; they ran to the home of Lindsey's sister where Lindsey snatched the gun from defendant and asked why he had shot the clerk; defendant said that he was " 'trigger happy.' " *Id.* ¶ 25. Lindsey did not testify to any of the foregoing statements at defendant's trial but, instead, refused to testify.

15

¶ 19     In her closing argument, the prosecutor contended that on May 27, 2009, defendant and Lindsey made sure the store clerk "had a past and no future" and, by the time of the 911 call, the store clerk was "a bloody corpse." In her rebuttal argument, the prosecutor stated:

> "Reasonable doubt, ladies and gentlemen, that is our burden. It's beyond a reasonable doubt. It's reasonable, not beyond all doubt, not beyond a shadow of a doubt, not 100 percent certainty, certainly not the 100 percent certainty that [Sheanneya] writes on her little identification, not that 100 percent positive. That's not what we have to prove. We have to prove beyond a reasonable doubt, and is it reasonable that this guy is fleeing with the murderer if that's the defense? Is it reasonable that he's going to run out of that store with a bag in hand and follow the guy with a gun if he wasn't in on it? That is unreasonable."

¶ 20     The jury found defendant guilty of first degree murder, finding that he, or someone for whose conduct he was legally responsible, was armed with a firearm.

¶ 21     Defendant filed a motion for a new trial, in which he argued, among other things, that the trial court erred by allowing the State to continue to examine Lindsey in the presence of the jury where the examination amounted to testimony by the prosecutor and assumed facts not in evidence. The prosecutor responded that her leading questions to Lindsey were proper to "impeach him with the earlier statements" where he had responded, "I don't remember." She continued, "at some point I stopped" because Lindsey "clearly was continuing to say either, no, or I want my, or I plead the Fifth." The trial court denied defendant's motion for a new trial.

¶ 22     The trial court sentenced defendant to 58 years of imprisonment. Defendant filed a motion to reconsider the sentence, which the trial court denied. Defendant appealed.

¶ 23                                   ANALYSIS

¶ 24    On appeal, defendant argues that he should receive a new trial because: (1) his constitutional right to confront witnesses was violated when the prosecutor continued her direct examination of Lindsey after Lindsey refused to answer leading questions regarding the day of the murder and repeatedly responded, "I plead the Fifth"; (2) the State improperly elicited testimony from Lindsey that he had been convicted of first degree murder on the basis of accountability; (3) the State improperly elicited testimony from McDaniel that he went to locate Lindsey and search the home of Lindsey's sister after speaking with defendant despite defendant's statements to McDaniel having previously been suppressed; and (4) the cumulative effect of the alleged errors, in addition to improper comments made by the prosecution during opening statements and closing arguments, deprived defendant of a fair trial. Alternatively, defendant requests that this court vacate the fines and fees assessed against him and remand this case for a proper order of monetary assessments because the trial court had not ordered any specific monetary assessments and the imposed assessments were erroneous.

¶ 25    In addressing the first issue, defendant argues that he is entitled to a new trial because the manner in which the prosecutor questioned Lindsey deprived him of his constitutional right to confront witnesses against him. Defendant claims he was unfairly prejudiced by the prosecutor's questioning because the inferences that could have been made from Lindsey's refusal to answer added "critical weight" to the State's case in a form not subject to cross-examination.

¶ 26    The State argues on appeal that the prosecutor was merely attempting to refresh Lindsey's recollection with his prior statements after Lindsey responded, "I plead the Fifth. I don't remember." During posttrial proceedings, the prosecutor had argued that her questioning of Lindsey was proper for impeaching Lindsey's response that he did not remember being with defendant on the day of the murder. The State additionally argues that the continued questioning

17

of Lindsey was not error because Lindsey had answered some questions, which created an inference he might be willing to answer additional questions. The State also claims the questioning was proper to refute assertions defendant's attorney made in his opening statement that it was Lindsey that had committed the murder. Finally, the State also claims that if the questioning was erroneous, it was harmless error.

¶ 27     The first issue raised by the parties of whether the continued questioning of Lindsey violated defendant's constitutional right of confrontation highlights the interplay between a prosecutor's right to compel a witness to testify under immunity and the right of the defendant on trial to confront witnesses despite a witness's refusal to testify. Inherent in those issues is the applicability of various Illinois Rules of Evidence and constitutional provisions, as is discussed below. Thus, in this case, a threshold issue is the use of a prior statement in questioning the witness without any attempt to lay a foundation for introducing the prior statement into evidence for impeachment or substantive use.

¶ 28     Generally, we review the trial court's evidentiary ruling of whether to admit certain testimony for an abuse of discretion. *People v. Lovejoy*, 235 Ill. 2d 97, 141 (2009). However, a defendant's claim that his right to confrontation was violated is a question of law subject to a *de novo* review. *Id*. at 141-42.

¶ 29                         I. Prior Inconsistent Statement

¶ 30     First, we address the State's claim that the prosecutor's questioning was proper to impeach Lindsey with a prior statement. Pursuant to Illinois Rule of Evidence 607: "[t]he credibility of a witness may be attacked by any party, including the party calling the witness, except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of affirmative damage. " Ill. R. Evid. 607

18

(eff. Jan. 1, 2011) (the affirmative damage requirement for using prior inconsistent statements for attacking the credibility of one's own witness does not apply to the admission of prior inconsistent statements that are admissible, in part, for substantive purposes pursuant to Illinois Rule of Evidence 801(d)(1)(A)(1) (eff. Oct. 15, 2015) (prior inconsistent statement in a criminal case where the witness was subject to cross-examination about the statement and the statement was made under oath)). Under Illinois Rule of Evidence 613(b), before a witness can be impeached with extrinsic evidence of a prior inconsistent statement, a proper foundation must be laid by affording the witness an opportunity to explain or deny it and the opposing party is afforded an opportunity to interrogate the witness about the statement. Ill. R. Evid. 613(b) (eff. Oct. 15, 2015); *People v. Bradford*, 106 Ill. 2d 492, 500 (1985).

¶ 31      While Illinois Rule of Evidence 613 allows the use of prior inconsistent statements solely for impeachment purposes, Illinois Rule of Evidence 801(d)(1)(A) and section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) allow for the admission of a prior inconsistent statement to be used for both impeachment purposes and as substantive evidence in criminal cases. Ill. R. Evid. 801(d)(1)(A)(1) ) (eff. Oct. 15, 2015) (in a criminal case, a prior inconsistent statement is admissible if the declarant is a testifying witness who is subject to cross-examination concerning the statement, and the prior inconsistent statement was made under oath at a trial, hearing, deposition, or other proceeding); 725 ILCS 5/115-10.1 (West 2012). Illinois Rule of Evidence 801(d)(1)(A) is a codification of section 115-10.1 of the Code. Ill. R. Evid., Committee Commentary. The purpose of section 115-10.1 of the Code is to " ' "protect parties from turncoat witnesses" ' " who, disown a prior statement by testifying inconsistently or claiming an inability to remember the subject matter. *People v. Brothers*, 2015 IL App (4th) 130644, ¶ 65 (quoting *People v. Fauber*, 266 Ill. App. 3d 381, 390 (1994) quoting Robert J.

19

Steigmann, *Prior Inconsistent Statements as Substantive Evidence in Illinois*, 72 Ill. B.J. 638, 640-41 (1984)).

¶ 32       The proper admission of a prior inconsistent statement under Rule of Evidence 801(d)(1)(A) and section 115-10.1 of the Code requires the proponent to lay a foundation for the statement.  See *Brothers*, 2015 IL App (4th) 130644, ¶ 68; *People v. Sykes*, 2012 IL App (4th) 100769, ¶¶ 37, 43-44 (the proponent must lay an adequate foundation for the witness's prior inconsistent statement to be admissible by establishing the time, place, and date of the statement and asking the witness whether she made the statement).  Laying the foundation for the admission of prior inconsistent statement for use as substantive evidence under Rule of Evidence 801(d)(1)(A) and section 115-10.1 of the Code is essentially the same as laying the foundation to impeach a witness with a prior inconsistent statement.  See *Brothers,* 2015 IL App (4th) 130644, ¶ 68.  The witness must have an opportunity to explain the inconsistency before the introduction of extrinsic evidence of the statement, which prevents unfair surprise and allows the opponent to cross-examine the witness regarding it.  *Id.*

¶ 33       If the witness unequivocally admits having made the prior inconsistent statement, he stands impeached.  *People v. Grayson*, 321 Ill. App. 3d 397, 406 (2001).  If the witness denies having made the prior statement, equivocates, or states that he cannot recall making the statement, then it is incumbent on the examining party to offer evidence of the statement.  *People v. Olinger,* 112 Ill. 2d 324 (1986); *People v. Purrazzo*, 95 Ill. App. 3d 886, 896-97 (1981); *People v. Moore*, 54 Ill. 2d 33 (1973) (where a witness states that he cannot remember a statement, the statement must be proven and counsel must be prepared to follow up with extrinsic evidence).

¶ 34    Even if a proper foundation were laid, it is error to lay a foundation for impeachment and then fail to substantiate the impeachment with evidence of the impeaching statement. *Purrazzo*, 95 Ill. App. 3d at 896-97. If such a rule did not exist, a witness could exclude evidence of what he had previously said or did simply by answering that he did not remember. *Id.* at 896. Failure to prove the prior statement will result in reversible error where the circumstances show sufficient prejudice. *People v. Adams*, 283 Ill. App. 3d 520, 526-27 (1996).

¶ 35    Here, the prosecutor's leading questions appear to be a reflection of the testimony Lindsey gave at his own trial about the day of the murder. See *Lindsey,* 2013 IL App (3d) 100625, ¶¶ 22-24. Lindsey's prior testimony may have been admissible as substantive evidence of a prior "inconsistent" statement under Rule 801(d)(1)(A)(1) and section 115-10.1 of the Code where Lindsey responded that he did not remember if he was with defendant on the day of the murder. See *People v. Redd*, 135 Ill. 2d 252, 308 (1990) (the "inconsistent" requirement under section 115-10.1 is met when a witness claims a memory loss at trial concerning a prior statement); *People v. Flores*, 128 Ill. 2d 66, 87 (1989) ("where a witness now claims to be unable to recollect a matter, a former affirmation of it should be admitted as a contradiction" (internal quotation marks omitted)). Arguably, if the proper foundation had been laid, Lindsey's prior trial testimony made under oath could have been admitted substantively as an "inconsistent" statement to Lindsey's response that he did not remember if he was with defendant on the day of the murder.

¶ 36    However, the prosecutor never attempted to lay a proper foundation regarding the prior statement made by Lindsey. Additionally, the prosecutor failed to offer any substantiating proof of the statement to complete the so-called impeachment. See *People v. Vinson*, 90 Ill. App. 3d 6, 9 (1980); *Purrazzo*, 95 Ill. App. 3d at 896-97 (holding that the prosecutor's leading questions

21

about the substance of an alleged prior statement of a witness who testified that he did not remember making the statement was improper impeachment where the State failed to introduce proof of the alleged statement).

¶ 37       Despite failing to lay a proper foundation and failing to provide proof of the prior statement, the prosecutor improperly disclosed the substance of Lindsey's alleged prior statement to the jury through leading or suggestive questions, which presumed facts not in evidence. See *People v. Williams,* 333 Ill. App. 3d 204, 210 (2002); *People v. Enis,* 139 Ill. 2d 264, 297 (1990) ("[t]he danger inherent in such questioning is that the jury will ignore the denial and presume the accuracy of the impeaching insinuation contained in the question"). Without the admission of the prior statement, Lindsey's refusal to respond to 20 of the prosecutor's leading questions about the murder by asserting his fifth amendment privilege resulted in defendant being deprived of meaningful cross-examination of Lindsey. See *Redd*, 135 Ill. 2d at 313-14 (assertions of the Fifth Amendment privilege by a witness may undermine the process to such a degree that meaningful cross-examination within the intent of the evidentiary rules no longer exists). Consequently, without the admission of the prior statement, the prosecutor's leading questions that placed Lindsey's alleged prior inconsistent statement before the jury constituted improper impeachment under applicable evidentiary rules.

¶ 38                                II.  Refreshing Recollection

¶ 39       The State additionally claims that the questioning of Lindsey was proper because the prosecutor was attempting to refresh Lindsey's recollection, where he had responded, "I don't remember" when asked whether he was with defendant on May 27, 2009. A witness's memory can be refreshed only after it is established that the witness has no memory concerning the fact in question. *People v. Shatner*, 174 Ill. 2d 133, 153 (1996). If a witness has testified that his

22

memory is exhausted, then a writing may be used to refresh his memory. Ill. R. Evid. 612 (eff. Jan. 1, 2011).

¶ 40        Here, Lindsey did not testify that his memory was exhausted or that a prior statement was needed to refresh his recollection of whether he was with defendant on May 27, 2009. Thus, our review of the record indicates that there was not a proper foundation laid by the prosecutor to support the State's claim that the prosecutor's questions were an attempt to refresh Lindsey's recollection with a prior statement.

¶ 41                              III. Confrontation Clause

¶ 42        On appeal, defendant specifically argues that he should receive a new trial because the State's direct examination of Lindsey violated his constitutional right to confrontation where the prosecutor continued to question Lindsey about the State's version of the murder, despite Lindsey's clear indication that he would not answer questions related to the day of the murder under the assertion of the fifth amendment privilege against self-incrimination. Once the prosecutor did not lay a proper foundation or attempt to introduce the prior statement, the prosecutor's continued questioning of Lindsey violated the defendant's right to confront witnesses under the confrontation clause where Lindsey repeatedly refused to testify citing a fifth amendment privilege against self-incrimination.

¶ 43        Under the fifth amendment, a witness may refuse to answer questions that may incriminate him. *People v. Ousley*, 235 Ill. 2d 299, 306 (2009). The fifth amendment to the United States Constitution, held applicable to the states (see *Malloy v. Hogan,* 378 U.S. 1 (1964)), provides that "[n]o person shall be *** compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. The privilege against self-incrimination " 'is an exception to the general principle that the Government has the right to everyone's testimony.' "

23

*People v. Stevens*, 2014 IL 116300, ¶ 16 (quotin*g Salinas v. Texas*, 570 U.S.__ , __ , 133 S. Ct. 2174, 2179 (2013)).

¶ 44 Under the sixth amendment, a defendant being accused has the right to confront witnesses against him. See U.S. Const., amend. VI (providing, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him"); *Pointer v. Texas,* 380 U.S. 400, 403 (1965) (applies to both federal and state prosecutions); *People v. Williams,* 238 Ill. 2d 125, 142 (2010) (providing the confrontation clause applies to the states through the fourteenth amendment (citing U.S. Const., amend XIV)). The Illinois Constitution was amended to conform to the language of the confrontation clause in the sixth amendment of the federal constitution. *People v. Lofton*, 194 Ill. 2d 40, 53 (2000) (confrontation clause of Illinois Constitution amended to provide, " '[i]n criminal prosecutions, the accused shall have the right *** to be confronted with witnesses against him or her' " (quoting Ill. Const. 1970, art. I, § 8 (amended Nov. 8, 1994))).

¶ 45 A primary interest of the confrontation clause is the right of cross-examination. *Douglas v. Alabama*, 380 U.S. 415, 418 (1965). The United States Supreme Court has stated:

"[T]he [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined. Cf. 3 Blackstone, Commentaries, at 373 ('[t]his open examination of witnesses . . . is much more conducive to the clearing up of truth'); M. Hale, History and Analysis

24

of the Common Law of England 258 (1713) (adversarial testing 'beats and bolts out the Truth much better')." *Crawford v. Washington*, 541 U.S. 36, 61-62 (2004).

¶ 46      Generally, a witness is considered subject to cross-examination when he takes the witness stand under oath and willingly answers questions and the opposing party has an opportunity to cross-examine him. *People v. Leonard,* 391 Ill. App. 3d 926, 934 (2009).

¶ 47      In this case, Lindsey was given "use-immunity" so that his testimony could not be used against him. See 725 ILCS 5/106-2.5 (West 2012) (providing the State the option of giving a witness use immunity if his testimony is necessary and the witness is otherwise likely to invoke his privilege against self-incrimination). Where a grant of immunity is given, the prosecutor has the right to demand and expect the witness's testimony, even under compulsion by the court if necessary. *People v. Crawford Distributing Co.,* 78 Ill. 2d 70, 75 (1979). Therefore, as defendant acknowledges in his brief on appeal, it was not error for the State to initially call Lindsey to the witness stand, in the presence of the jury, when Lindsey had been given immunity. See *id.* at 74 (the act of a prosecutor calling a witness to the stand, in the presence of the jury, when the prosecutor has advance knowledge that the witness will invoke the fifth amendment right not to testify may or may not be error).

¶ 48      Lindsey took the witness stand, answered some preliminary questions, and identified the defendant in court and as an "associate." Lindsey answered questions that were arguably non-testimonial or not incriminating. See *People v. Redd*, 135 Ill. 2d 252 (1990) (providing that the privilege against self-incrimination does not exist where there are no reasonable grounds to fear self-incrimination). After Lindsey answered preliminary questions, the prosecutor turned her questioning to the day of the murder. In response to the question of whether Lindsey was with

25

defendant on the day of the murder, Lindsey responded, "I plead the Fifth. I don't remember." Thereafter, the prosecutor questioned Lindsey regarding the circumstances and details of the crime, which Lindsey refused to answer. The prosecutor permissibly began asking Lindsey leading questions because he was obviously hostile or unwilling to answer. See Ill. R. Evid. 611(c) (eff. Oct. 15, 2015) (providing that interrogation of a hostile or an unwilling witness may be by leading questions).

¶ 49        However, thereafter, without attempting to introduce Lindsey's prior statement pursuant to Rule of Evidence 613(b) or Rule 801(d)(1)(A)(1) and laying the foundation for its admission, the prosecutor asked multiple leading and suggestive questions regarding all of the circumstances surrounding the alleged robbery and the murder of the store clerk on the day in question, which Lindsey refused to answer. Lindsey responded "I plead the Fifth" to 20 questions. As a result of the leading questions, the State's theory of the case regarding the circumstances of the murder was placed before the jury. Again, with no attempt to put into evidence Lindsey's prior statement, the testimonial aspects of the examination of Lindsey regarding the circumstances of the crime came from the prosecutor's questions and not from Lindsey.

¶ 50        Due to Lindsey's refusal to testify, defendant was unable to confront and cross-examine Lindsey on matters to which Lindsey had not testified and for which he was not available for cross-examination. This circumstance is very different from cases in which a witness claims a memory loss or denies making a previous statement and the prior statement was introduced properly as impeaching and/or substantive evidence. See, *e.g.*, *People v. Hampton*, 387 Ill. App 3d 206, 209 (2008) (witness was available for cross-examination despite testifying that he could not recall details about the crime when the prior statement was introduced into evidence); *cf. In re Rolandis G.,* 232 Ill. 2d 13, 34 (2008) (finding that the victim was unavailable for cross-

26

examination where the victim refused to testify about the crime at defendant's trial and there was no prior opportunity for defendant to cross-examine the victim). It was error for the trial court to allow the prosecutor to continue questioning Lindsey about all of the circumstances of the murder and disclose Lindsey's prior testimony through leading questions, in the presence of the jury, in the absence of the prosecutor's introduction of the prior statement pursuant to Rule of Evidence 613(b) or Rule 801(d)(1)(A)(1).

¶ 51    In his brief on appeal, defendant cites *Douglas v. Alabama*, 380 U.S. 415 (1965) to support his claim that his constitutional right to confrontation was violated by the prosecutor's questioning of Lindsey. In *Douglas,* the defendant and his codefendant were charged with assault with intent to commit murder, and the codefendant was tried and found guilty prior to defendant's trial. *Id.* at 416. Prior to the codefendant's sentencing, the State called him as a witness in defendant's trial. *Id.* at 416 n.1. The codefendant testified to his name and address but invoked the privilege against self-incrimination to 21 questions about the alleged crime. *Id.* at 417 n.2. Under the guise of refreshing the codefendant's recollection, the prosecutor read the codefendant's entire written statement that detailed the alleged crime and indicated the defendant had fired the shotgun that had wounded the victim. *Id*. at 416-17. The prosecutor had paused after every few sentences and asked the codefendant, " 'Did you make that statement?' " *Id.* at 416. The prosecutor did not offer the codefendant's written statement into evidence. *Id.* at 417. The trial court threatened to hold the codefendant in contempt for refusing to testify, finding that the fifth amendment privilege against self-incrimination was not available because the

27

codefendant had already been convicted.[2]  *Id.* at 416 n.1.  The jury found the defendant guilty, and the appellate court affirmed his conviction.  *Id.* at 417-18.  The United States Supreme Court reversed, holding that the defendant's inability to cross-examine the codefendant denied the defendant the right of cross-examination secured by the confrontation clause.  *Id.* at 419.  The *Douglas* court noted that the only proof that the defendant had intended to commit the crime was the prosecutor's reading of the codefendant's alleged statement, which "may well have been the equivalent in the jury's mind of testimony that [the codefendant] in fact made the statement."  *Id.*  The *Douglas* court indicated that effective confrontation of the codefendant was possible only if the codefendant had affirmed the alleged statements as his, but his refusal to answer "added critical weight to the prosecution's case in a form not subject to cross-examination."  ( Internal quotation marks omitted.)  *Id.* at 420.

¶ 52        Without the introduction of Lindsey's prior statement, similar to *Douglas*, the witness in this case, Lindsey, did not testify to the facts of the crime.  Yet, Lindsey's statement that defendant committed the crime was nonetheless presented to the jury through the prosecutor's leading questions.  Without laying the foundation for Lindsey's prior inconsistent statement, the result of Lindsey's refusal to answer questions about the murder was that the State was able to present its theory of the case without defendant having the ability to cross-examine Lindsey on those matters.  At some point during the questioning, defendant's counsel specifically objected to the questioning, indicating, "[t]his is just the prosecutor testifying at this point, your Honor."  Without any acknowledgement by the witness or admission of the prior statement, the prosecutor

_____

[2]   In *Douglas*, the trial court did not hold the codefendant in contempt but, rather, interrupted defendant's trial to sentence the codefendant to 20 years of imprisonment.  *Douglas*, 380 U.S. at 416 n.1.

factually presented the jury with her version of the circumstances of the crime with no supporting evidence thereof. Therefore, we hold that regardless of the grant of immunity to Lindsey and regardless of whether Lindsey actually had the right to assert the fifth amendment, without the admission of the prior statement, defendant's right to confrontation was violated where, over defendant's objection, in the presence of the jury, Lindsey refused to answer 20 of the prosecutor's leading and suggestive questions about the alleged crime.

¶ 53                                    IV.  Harmless Error Review

¶ 54        The State argues that even if we find that error resulted from the prosecutor's questioning of Lindsey, any such error was harmless. The issue in this case was not an evidentiary matter of whether the admission of an out-of-court statement into evidence was proper. Thus, we do not apply an evidentiary harmless error review. See *Brothers*, 2015 IL App (4th) 130644, ¶ 97 (improper admission of evidence is harmless where there is no reasonable probability that, if the evidence had been excluded, the outcome would have been different).

¶ 55        Rather, we determined that the prosecutor's leading questions, for which there was no evidentiary support and to which Lindsey had refused to respond, violated the defendant's constitutional right to confrontation. In determining whether a violation of the confrontation clause error is harmless, we look to whether it appears beyond a reasonable doubt that the error did not contribute to the verdict obtained. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). In so determining if the error was harmless, there are three approaches for measuring the error:  (1) focusing on the error to determine whether it contributed to the conviction; (2) determining whether the other evidence overwhelming supports the conviction; and (3) determining whether improperly admitted evidence is merely cumulative or duplicates properly admitted evidence.

29

*Id.* The State bears the burden of proving the violation of the confrontation clause was harmless. *Id.*

¶ 56　　　　In this case, without the proper admission of the prior statement, defendant was prejudiced by the prosecutor's questioning of Lindsey where the prosecutor's questions insinuated that a robbery was planned, a robbery occurred, defendant initiated the robbery, and defendant was the gunman who shot and killed the store clerk. The evidence of defendant's guilt of felony murder in this case was not overwhelming. Other than the testimony given by defendant's cellmate of a conversation he claims to have had with defendant, which was called into doubt by the testimony of another inmate, there was no evidence that a robbery or attempted robbery was planned or took place, or that defendant shot the store clerk. Although the other evidence showed that defendant was leaving the gas station with Lindsey, Lindsey was the person seen carrying the gun and Lindsey's fingerprint was on the gun, with no indication of what had transpired inside the gas station store.

¶ 57　　　　Although we recognize that the testimony of jail house informants is not to be viewed as inherently unbelievable and their credibility is a question for the jury, it is true that the testimony of jail house informants must be viewed with caution. *People v. Belknap*, 2014 IL 117094, ¶ 54. Here, the prosecutor improperly brought every detail of Lindsey's prior testimony to the attention of the jury, and it could be argued that it had a prejudicial influence in the minds of the jury due to the indication that the defendant committed the crime for which he was being tried.

¶ 58　　　　Without laying a foundation and admitting the prior inconsistent statement, the prosecutor's questions attributed statements, which were not in evidence, to Lindsey that were fundamentally part of the State's case and the inferences that could be drawn from Lindsey's refusal to answer those questions "added critical weight" to the State's case in a form not subject

to cross-examination in violation of the confrontation clause. *See Douglas*, 380 U.S. at 420. Those questions created a substantial risk that the jury would look to the implicit statements therein, which were not in evidence, to determine the defendant's guilt. Thus, the questioning of Lindsey by the prosecutor was not harmless beyond a reasonable doubt, and we reverse defendant's conviction and remand for a new trial.

¶ 59        Given our disposition on the first issue, we need not address the other issues raised. However, for the purposes of remand, we note that the prosecutor's remarks during closing arguments regarding the State's burden of proof of "beyond a reasonable doubt" were improper. The prosecutor's remarks conflated the "beyond a reasonable doubt" standard with a question of whether the actions of the defendant after the crime were reasonable, which could confuse a jury and tend to lessen the State's burden of proof. See *People v. Downs*, 2015 IL 117934, ¶ 18 (defining reasonable doubt violates a defendant's due process right if there is a reasonable likelihood that jurors understood the instruction to allow conviction upon proof less than beyond a reasonable doubt) (citing *Victor v. Nebraska*, 511 U.S. 1, 5-6 (1994)). Neither the trial court nor counsel should define reasonable doubt for the jury. *Id.* ¶ 19 (the phrase "reasonable doubt" is self-defining and needs no further definition).

¶ 60                                                    CONCLUSION

¶ 61        The judgment of the circuit court of Peoria County is reversed and this cause is remanded for a new trial.

¶ 62        Reversed and remanded.

¶ 63        JUSTICE SCHMIDT, dissenting.

¶ 64                            I. The State's Direct Examination of Lindsey

¶ 65      At the outset, the majority concludes "a threshold issue [in this case] is the use of \*\*\* prior statement[s] in questioning the witness without any attempt to lay a foundation for introducing the prior statement into evidence for impeachment or substantive use." *Supra* ¶ 27. The majority goes on to condemn the prosecution repeatedly for failing to lay a proper foundation.

¶ 66      "Arguably, if the proper foundation had been laid, Lindsey's prior trial testimony made under oath could have been admitted substantively as an 'inconsistent' statement to Lindsey's response \*\*\*." *Supra* ¶ 35. "[T]he prosecutor never attempted to lay a proper foundation regarding the prior statement made by Lindsey. Additionally, the prosecutor failed to offer any substantiating proof of the statement to complete the so-called impeachment." *Supra* ¶ 36. "Despite failing to lay a proper foundation and failing to provide proof of the prior statement, \*\*\*" (s*upra* ¶ 37) "our review of the record indicates that there was not a proper foundation laid by the prosecutor to support the State's claim that the prosecutor's questions were an attempt to refresh Lindsey's recollection with a prior statement." *Supra* ¶ 40. "[W]ithout attempting to introduce Lindsey's prior statement pursuant to [the rules of evidence] and laying the foundation for its admission, the prosecutor asked multiple leading and suggestive questions \*\*\*." *Supra* ¶ 49.

¶ 67      The defendant never objected on foundational grounds at trial, forfeiting any related issues on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Johnson*, 218 Ill. 2d 125, 138 (2005). Further, there was no prejudice in not admitting Lindsey's prior statements. The statements, in the form of trial transcripts, were readily available to and undoubtedly in the possession of both parties. Had the defendant objected to a lack of foundation, the issue would have been resolved. It was likely a street-smart decision on defense counsel's part not to object

32

on foundational grounds at trial. Admitting Lindsey's prior statements would have been detrimental to the defendant. Regardless, any errors in examining Lindsey were harmless.

¶ 68        Criminal defendants are guaranteed a fair trial, not a perfect one. *People v. Bull*, 185 Ill. 2d 179, 214-15 (1998). Witness examination errors are subject to harmless error review. *People v. Patterson*, 217 Ill. 2d 407, 427 (2005); *People v. Kliner*, 185 Ill. 2d 81, 134-35 (1998). An alleged constitutional error is harmless when it appears beyond a reasonable doubt that the errors did not contribute to defendant's guilty verdict. *Patterson*, 217 Ill. 2d at 428. Such is the case with the errors arising from the State's examination of Lindsey. Beyond a doubt, they are not grounds for reversal.

¶ 69        There are three potential approaches to measuring whether witness examination errors were harmless: (1) focusing on the error itself to determine whether it contributed to the defendant's conviction; (2) examining the other evidence in the case to see if it was overwhelmingly in support of defendant's conviction; and (3) determining whether any improperly admitted evidence is merely cumulative or duplicative of the properly admitted evidence. *People v. Stechly*, 225 Ill. 2d 246, 304-05 (2007) (quoting *Patterson*, 217 Ill. 2d at 428, citing *People v. Wilkerson*, 87 Ill. 2d 151, 157 (1981)). By all three measures, the errors in the State's examination of Lindsey were harmless and did not contribute to the defendant's conviction.

¶ 70                    A. The State's Continued Questioning of Lindsey

¶ 71        The majority concludes that the trial court violated defendant's sixth amendment right to confrontation. "Without the admission of the prior statement, Lindsey's refusal to respond to 20 of the prosecutor's leading questions about the murder by asserting his fifth amendment privilege resulted in defendant being deprived of meaningful cross-examination of Lindsey." *Supra* ¶ 37.

33

"Once the prosecutor did not lay a proper foundation or attempt to introduce the prior statement, the prosecutor's continued questioning of Lindsey violated the defendant's right to confront witnesses under the confrontation clause ***." *Supra* ¶ 42. "Without laying the foundation for Lindsey's prior inconsistent statement, the result of Lindsey's refusal to answer questions about the murder was that the State was able to present its theory of the case without defendant having the ability to cross-examine Lindsey on those matters." *Supra* ¶ 52. "[W]ithout the admission of the prior statement, defendant's right to confrontation was violated ***." *Supra* ¶ 52. "Without laying a foundation and admitting the prior inconsistent statement, the prosecutor's questions attributed statements, which were not in evidence, to Lindsey that were fundamentally part of the State's case and the inferences that could be drawn from Lindsey's refusal to answer those questions 'added critical weight' to the State's case in a form not subject to cross-examination in violation of the confrontation clause. [Citation.]" *Supra* ¶ 58.

¶ 72        The prosecution did not violate the confrontation clause in continuing to question Lindsey. Lindsey became uncooperative after he started to testify. The prosecution peppered him with leading questions that he refused to answer. Afterward, the trial court offered defense counsel an opportunity to cross-examine him. *Supra* ¶ 14. This does not equate to a confrontation clause violation. See *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (*per curiam*) ("Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.)).

¶ 73        Lindsey was given use immunity and therefore had no fifth amendment privilege to invoke. Once a witness is given immunity, the State is entitled to demand the witness's testimony. *People v. Pirrello*, 166 Ill. App. 3d 614, 621 (1988); see also *People v. Calabrese*,

34

398 Ill. App. 3d 98, 108 (2010). Furthermore, Lindsey's silence only benefited the defendant. Any cross-examination by defense counsel would have opened the door to impeachment by the State. Defense counsel's wise decision not to cross-examine Lindsey does not equal a denial of defendant's right to cross-examine.

¶ 74    The trial court had to perform a delicate balancing act during the prosecution's examination of Lindsey. Lindsey was already incarcerated and granted use immunity. He did not have any valid claim to assert his right against self-incrimination. *Supra* ¶ 77. Once he began asserting this right, however, the trial court had minimal recourse to influence Lindsey's behavior. Since he was already incarcerated for murder, being held in jail for contempt offered no practical means to gain his compliance. Under the circumstances, allowing the prosecutor to ask leading questions—which did not go completely unchecked by the trial court—was not, *per se*, an abuse of discretion.

¶ 75    There was a good faith basis for the prosecutor's questions. The State was seeking to confirm Lindsey's testimony from his own trial. See *supra* ¶¶ 15 n.1, 35. The prosecution gained nothing from Lindsey's silence during direct examination and could not build its case on it. Hence, the prosecution's repeated attempts to question Lindsey in spite of the fact that he was no longer cooperating. Accordingly, there is no valid argument that this was prosecutorial misconduct.

¶ 76    The majority characterizes the State's case against defendant as being entirely reliant on the prosecutor's leading questions. While continuing to decry the prosecution's failure to comply with rules of evidence, which the defendant never objected to, the majority continues: "Again, with no attempt to put into evidence Lindsey's prior statement, the testimonial aspects of the examination of Lindsey regarding the circumstances of the crime came from the prosecutor's

35

questions \*\*\*." *Supra* ¶ 49. "It was error for the trial court to allow the prosecutor to continue questioning Lindsey about all of the circumstances of the murder and disclose Lindsey's prior testimony through leading questions, in the presence of the jury, in the absence of the prosecutor's introduction of the prior statement[s] pursuant to [the rules of evidence]." *Supra* ¶ 50. "Without the introduction of Lindsey's prior statement, similar to *Douglas*, the witness in this case, Lindsey, did not testify to the facts of the crime." *Supra* ¶ 52. "Without any acknowledgement by the witness or admission of the prior statement, the prosecutor factually presented the jury with her version of the circumstances of the crime with no supporting evidence thereof." *Supra* ¶ 52. "[W]ithout the proper admission of the prior statement, defendant was prejudiced by the prosecutor's questioning of Lindsey where the prosecutor's questions insinuated that a robbery was planned, a robbery occurred, defendant initiated the robbery, and defendant was the gunman who shot and killed the store clerk." *Supra* ¶ 56. "[T]here was no evidence that a robbery or attempted robbery was planned or took place, or that defendant shot the store clerk." *Supra* ¶ 56. While the majority concedes that defendant and Lindsey were seen leaving the scene of the crime with the murder weapon, it asserts that there was "no [other] indication of what had transpired inside the gas station store." *Supra* ¶ 56.

¶ 77 The majority concludes that the prosecution's continued questioning of Lindsey added critical weight to the case. *Supra* ¶ 58. That is inaccurate. The prosecution's leading questions did not bolster the State's argument. It would be reversible error only if Lindsey's silence was the primary means by which the prosecution built its case. See *Namet v. United States*, 373 U.S. 179, 189 (1963). That is not the case here. As in *Namet*, this case "is not one \*\*\* in which a witness' refusal to testify is the only source, or even the chief source, of the inference that the witness engaged in criminal activity with the defendant." *Id*. at 189.

36

¶ 78       The prosecutor's statements were duplicative of other evidence presented at trial. For example, Sheanneya Sherman testified to seeing the defendant and someone later identified as Lindsey run out of the store immediately before the victim was found dead inside. She also saw Lindsey holding the gun that was later found in Lindsey's sister's apartment—with his fingerprint on it—and identified as the murder weapon. The majority's assertion that there was "no evidentiary support" for the prosecutor's leading questions simply is not true. *Supra* ¶ 55.

¶ 79       The victim's dead body, the eyewitness testimony presented at trial, and the murder weapon with Lindsey's fingerprint on it are all solid evidentiary support. Thus, the prosecutor's leading questions did not provide critical weight to the State's case. The majority takes issue with the fact that, like the prosecution in *Douglas v. Alabama*, the prosecutor in this case "did not offer the codefendant's written statement into evidence." *Supra* ¶ 51 (citing *Douglas v. Alabama*, 380 U.S. 415, 417 (1965)). As the majority points out, however, in *Douglas*, the only proof of the defendant's guilt was the witness's prior statements. *Supra* ¶ 51. That is not the case here.

¶ 80       Moreover, Lindsey was subject to cross-examination. *Supra* ¶ 14. The trial court asked defense counsel whether he had questions for Lindsey. Defense counsel did not respond. The record shows Lindsey was hostile to the prosecution, not the defendant. Lindsey even commented that defendant looked "real nice" when he identified him in court and wished him "[g]ood luck with [his] trial" before he got off the stand. *Supra* ¶ 14.

¶ 81                          B. Lindsey's Incarceration Testimony

¶ 82       Defendant's claim that Lindsey's testimony regarding his incarceration and conviction for murder violated his right to a fair trial fails on the merits as well. Defendant forfeited this issue and it does not rise to the level of plain error. In order to preserve an issue for appeal

37

defendants must object at trial and raise the issue in a posttrial motion. *Enoch*, 122 Ill. 2d at 186; *Johnson*, 218 Ill. 2d at 138. Defendant did neither, but asserts the plain-error doctrine applies.

¶ 83 The plain-error doctrine is a limited exception to the general rule of procedural default; we can only consider upreserved errors when: " ' "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." ' " *People v. Sebby*, 2015 IL App (3d) 130214, ¶ 35 (quoting *People v. Walker*, 232 Ill. 2d 113, 124 (2009), quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). As discussed above, the evidence in this case was also not closely balanced. Further, Lindsey's testimony did not violate any of defendant's substantial rights denying him a fair trial.

¶ 84 Evidence that a codefendant was convicted of the crime for which the defendant is on trial is generally inadmissible in that defendant's trial. *People v. Sullivan*, 72 Ill. 2d 36, 42 (1978). Evidence of the codefendant's conviction is admissible, however, for the purpose of impeaching the codefendant. *Id.*

¶ 85 When asked if he was presently incarcerated for first degree murder, Lindsey answered in the affirmative and further volunteered that it was under a theory of "[a]ccountability." There was no mention of the victim in this case. Later in the examination, after Lindsey became uncooperative, the prosecutor stated that Lindsey's fingerprints were on the murder weapon in this case. Instead of explaining that fact, Lindsey replied "[t]o my knowledge, it's not my trial. I got found guilty, remember." These were both nonresponsive answers. They were also general and do not implicate Lindsey for the murder of defendant's victim in this case.

38

¶ 86    The prosecution committed no error, let alone an obvious error, in asking the questions that preceded Lindsey's answers. Furthermore, Lindsey's "accountability" statement was nonresponsive to the prosecutor's question. None of Lindsey's testimony specifically states that he was in jail for the murder for which defendant was on trial. The mere possibility the jury might have inferred Lindsey was convicted of the same murder for which the defendant was on trial does not violate the integrity of the judicial process. Accordingly, defendant's claim on this issue fails on the merits.

¶ 87                    II. Defendant's Motion for a Mistrial

¶ 88    At trial, Detective McDaniel confirmed that after having a conversation with the defendant, he went to Lindsey's sister's house to search it. *Supra* ¶ 10. Defense counsel objected, arguing that defendant's confession had been suppressed by this court and the detective's testimony implied defendant gave the police information about the murder. The trial court expressed concern over the testimony, but ultimately declined to declare a mistrial. The trial court further instructed the jury to disregard that portion of the detective's testimony.

¶ 89    We review the denial of a motion for a mistrial for abuse of discretion. *People v. Walker*, 386 Ill. App. 3d 1025, 1030 (2008) (citing *People v. Bishop*, 218 Ill. 2d 232, 251 (2006)).

¶ 90    On appeal, defendant makes the same argument he asserted at trial, claiming McDaniel's testimony violated this court's original ruling in defendant's first appeal, which suppressed his statement to the police. Defendant argues McDaniel's testimony led the jury to infer that defendant gave the police incriminating information. The State counters that this may have been a reference to suppressed evidence, however, the officer did not provide any details implicating the defendant. The State further argues the judge cured any potential negative inference that the jury might have drawn by immediately issuing a limiting instruction.

39

¶ 91       Police officers may testify to their investigatory procedures without violating the hearsay rule, "even if a logical inference may be drawn that the officer took subsequent steps as a result of the substance of that conversation." *People v. Jones*, 153 Ill. 2d 155, 159-60 (1992) (citing *People v. Gacho*, 122 Ill. 2d 221 (1988)); *People v. Shorty*, 408 Ill. App. 3d 504, 510 (2011). Mistrials are only necessary when a jury is so influenced and prejudiced that the damaging effects of the error cannot be cured by admonitions and instructions. *People v. Garrett*, 276 Ill. App. 3d 702, 713 (1995).

¶ 92       The trial court did not abuse its discretion in denying defendant's motion for a mistrial. Detective McDaniel provided no details regarding the substance of defendant's statement. The mere potential for a mistrial is not enough to establish that the trial court abused its discretion. While there may have been a negative inference drawn from McDaniel's testimony by the jury, there was just as equal a chance the jury drew no inference or a positive inference from McDaniel's testimony. See, *e.g.*, *Calabrese*, 398 Ill. App. 3d at 125 (noting that a "defendant could just as easily benefit from the witness because the jury could infer that [the witness] was the shooter and thus invoked his fifth amendment right to protect himself"). Thus, defendant is not entitled to a mistrial on this ground.

¶ 93       III. Defendant's Cumulative Error Arguments

¶ 94       Defendant further claims the errors raised in the first two issues and "a variety of improper arguments" made by the prosecutor at trial amount to cumulative error. Beyond the issues already addressed above, defendant argues the prosecutor made improper remarks during closing arguments and opening statements. The State reasserts the same arguments in response to the first two issues, and further argues defendant forfeited his arguments regarding the

prosecution's opening statements and closing arguments by failing to object at trial and raise them in a posttrial motion.

¶ 95　　　　In raising his cumulative error argument, defendant raises issues not raised at trial or in a posttrial motion. Defendant forfeited the additional issues he now raises for the first time on appeal. See *Enoch*, 122 Ill. 2d at 186; *Johnson*, 218 Ill. 2d at 138. Furthermore, defendant does not argue plain error applies to this issue or that the additional errors alleged implicate substantial rights. Therefore, defendant has forfeited this argument as well. Ill. S. Ct. R. 615(a); *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 96　　　　　　　　　　IV. The Fine and Fee Assessment Imposed Upon Defendant

¶ 97　　　　Defendant argues, alternatively, that the fine and fee assessment imposed upon him should be vacated. Specifically, defendant argues the assessment should be remanded to the trial court for proper entry of an order of enumerated costs because the trial court did not order the specific monetary assessments imposed. Rather, the circuit clerk imposed specific assessments after defendant was sentenced, and the calculation of those assessments was subject to multiple errors. The State concedes these errors.

¶ 98　　　　The imposition of a fine is a judicial act and the circuit clerk has no authority to impose them. *People v. Williams*, 2013 IL App (4th) 120313, ¶ 16 (citing *People v. Swank*, 344 Ill. App. 3d 738, 747-48 (2003)). Therefore, any fines imposed by a circuit clerk are void at their inception.

¶ 99　　　　For the reasons state above, I would affirm defendant's conviction and vacate the fines imposed by the circuit clerk.

41